**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNLIMITED RESOURCES INCORPORATED,      Case No.: 3:07-cv-961-J-12MCR
A Florida corporation,

                    Plaintiff,

v.                                                              **DISPOSITIVE MOTION**

DEPLOYED RESOURCES, LLC,
A foreign limited liability company,

                    Defendants.
_____/

## DEFENDANT DEPLOYED RESOURCES, LLC'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Defendant DEPLOYED RESOURCES, LLC and files this Dispositive Motion for Summary Judgment and Memorandum of Law in support thereof and requests that this Court grant summary judgment as to all or part of Plaintiff's claims.

In support of its Motion, Defendant relies on the pleadings, the depositions filed, the answers to discovery, the documents produced during discovery, and the Affidavits of Richard Stapleton and Bruce R. Wagner, Sr.

**I.      INTRODUCTION.**

### There is no contract between Unlimited Resources and Deployed Resources.

After the September 11, 2001 national tragedy, Unlimited Resources Incorporated's ("Unlimited") President, Charles E. "Chuck" Johnson ("Johnson"), called Richard Stapleton ("Stapleton") Deployed Resources, LLC ("Deployed") on September 17, 2001 regarding performing emergency disaster work for Garner Environmental ("Garner") for first responders to the tragedy. (Deposition of Johnson, Doc. No. 101-2,

1

pp. 25:24-26:4)  This was the first contact by Unlimited to Deployed. (Deposition of Stapleton, pp. 172:8 – 173:3, attached hereto as Exhibit 1.)  During that brief conversation, it was orally agreed that Deployed would pay Unlimited 10% of the gross that Deployed received on the work for Garner. (Exhibit 1, Deposition of Stapleton, pp. 174:10-19; 175:21-23.)  On October1, 2001, Unlimited faxed an unsolicited Emergency Disaster Agreement (attached hereto as Exhibit 2) that was signed by Johnson but never signed or agreed to by Deployed. (Exhibit 1, Deposition of Stapleton, pp. 45-20-46:16)

After performing the work for Garner, based on the actual costs of the work Stapleton told Johnson that due to the high costs Deployed would lose money on the contract by paying 10% of the gross. (Exhibit 1, Deposition of Stapleton, pp. 174:20-175:12.)  Stapleton and Johnson agreed that instead of paying the 10% of the gross Deployed would pay Unlimited50% of the small profit.  (Exhibit 1, Deposition of Stapleton, pp. 43:16-21.)  On November 13, 2001,  Deployed paid Unlimited its share or One Thousand Five Hundred and Sixty-Two Dollars ($1,562.00). (Exhibit 3)

Over the next few years, Johnson sent several Emergency Disaster Agreements (Proposed Agreements) to Stapleton to sign; the last being August 2006.  (Copies of the Proposed Agreements are attached hereto as Exhibit 4.)  None of the additional Proposed Agreements were signed by Deployed or Unlimited. (Exhibit 1, Deposition of Stapleton, pp. 44:1-45:16.) Each of the Proposed Agreements contained different terms.  In February 2002, Deployed made substantial changes to the initial Proposed Agreement and sent the Proposed Agreement containing terms Deployed would be willing to pay to Unlimited. (Exhibit 5;.Exhibit 1, Deposition of Stapleton, pp. 46:21-47:9; 161:9-162:24.) Johnson denied he ever received the Proposed Agreement.  Unlimited and Deployed

never agreed on the terms of any Proposed Agreement. (Exhibit 1, Deposition of

Stapleton, pp. 44:1-45:16; 165:18-166:18.)  Deployed made it abundantly clear that it

would never agree to pay Unlimited 10% of the gross because Deployed knew, after

performing the Garner contract, that 10% of the gross would not allow Deployed to make

any money while it performed all of the actual work.  (Exhibit 1, Deposition of Stapleton,

pp. 138:25-139:11; 167:11-14;169:15-170:5.)

 To the extent Unlimited generated revenue for Deployed, payment to Unlimited

was based on a case by case basis. (Exhibit 1, Deposition of Stapleton, pp. 42:14-20;

119:15-17.) Deployed usually paid Unlimited  10% of the rental value of the contract,

based on the rental of equipment.  (Exhibit 1, Deposition of Stapleton, pp. 164:24-

165:14; 201:13-202:3.) Deployed never paid 10% of the gross of any contract. (Exhibit 1,

Deposition of Stapleton, pp. 42:24-43:15.)  Unlimited performed work for Deployed

based on that arrangement..

 The contracts which Unlimited procured for Deployed included Comfort Zone

Portables ("Comfort Zone") for performing emergency disaster work resulting from

Hurricanes Charley, Frances, Ivan, Dennis and Wilma.   Deployed also paid Unlimited

for Florida contracts procured from the FL-DEM and FL-DOH for emergency disaster

work as a result of Hurricanes Charley, Dennis, Katrina and Wilma. (See October 3, 2006

letter, attached hereto as Exhibit 6 total of $366,562.00.  (Exhibit 1, Deposition of

Stapleton, pp. 185:5-186:24; Exhibit 6.)

 Plaintiff failed to establish the essential terms of any contract that Unlimited

contends is at issue. Many questions were asked of Johnson during his depositions

regarding the terms of the agreement between the parties.  The responses were never the

same during the deposition and were attempted to be changed by an errata sheet.[1] The

terms of the agreement testified to by Johnson differed from those testified to by

Stapleton. (Deposition of Johnson, Doc. No.101-2, pp. 11:14-19 (changed by errata),

31:23-33:23 (changed by errata), 34:7-35:11 (changed by errata), 39:21-41:3, 98:22-

101:15; Deposition of Johnson, Doc. No. 101-3, pp. 216:8-218:18; Deposition of

Johnson, Doc. No. 101-4, pp. 396:14-25, 407:24-408:8, 411:8-25 (changed by errata);

Exhibit 1, Deposition of Stapleton, pp. 56:13-57:7; 159:5-7; 160:10-161:8; Affidavit of

Richard Stapleton, Doc. No. 101-11.) Not only is there a lack of mutual agreement, but

the only course and conduct between the Parties has been that payment is based on the

rentals, without objection by Unlimited.   Therefore, Unlimited cannot establish a breach

---

[1] Plaintiff's theory of procurement changed as did his deposition testimony through an errata sheet.  Attached hereto as Exhibit 11 is a strike through version of Plaintiff's errata sheet showing the changes with the actual videotaped deposition transcribed testimony.

Under the Federal Rule of Civil Procedure, Rule 30(e), the deponent is allowed 30 days after being notified that the deposition is available to review it and if there are changes to sign a statement listing the changes and the reasons for making them:

30(e) Review by the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

Plaintiff failed to comply with Rule 30 in that Plaintiff has failed to set forth the reasons for the changes. Further, according to the Court Reporters, they did not receive Plaintiff's errata sheet. See April 21, 2009 Affidavits of Laura D. Pierle, RPR, and Janet M. Beason, RPR, RMR, CRR, attached hereto as Exhibit 12. Defendant only learned of the errata sheet through Plaintiff's filings with the Court.  The Court should not consider the errata sheet as it does not comply with Rule 30 and is impermissible.

of any contract with Deployed because there was a failure to agree upon the terms of any contract except on a case by case basis.

### The Hurricane Katrina Clearbrook Subcontract with Deployed.

Deployed received a subcontract to provide temporary housing for first responders from Clearbrook LLC (Clearbrook) whose President was Bruce R. Wagner Sr. (Wagner). Clearbrook had obtained the contract from FEMA and hired Deployed to provide the temporary housing. Plaintiff contends that it is entitled to compensation for procuring that contract for Deployed. The following facts show that Unlimited had nothing to do with obtaining, procuring or assisting Deployed in obtaining the Clearbrook contract; and that Unlimited has no entitlement for payment.

It is undisputed that Johnson met Richard "Dick" Cheek ("Cheek") sometime in 2000 when Cheek was working for the State of Florida as the Deputy Logistics Chief. Cheek then worked for the North Carolina Division of Emergency Management under his supervisor, Eric Tolbert ("Tolbert") who was the Director. (Exhibit 7, Deposition of Scott Lawson ("Lawson"), pp. 8:18-20)  During that period Cheek introduced Johnson to Tolbert.  Tolbert then went to work for FEMA as a Deputy Director in April 2002 and he later asked Cheek to work for him.  Cheek went to work for FEMA in 2004.(Deposition of Richard Cheek pp. 23:3-15)  After working for FEMA for a little over two years, Tolbert left FEMA  in February 2005 and went to work for Post, Buckley, Shuh, Journigan ("PBS&J"), a Florida engineering firm. (Exhibit 7, Deposition of Lawson, pp. 6:4-7:13; Exhibit 8, Deposition of Cheek, pp. 22:25-24:2.)  Cheek left FEMA in June 2005 and joined PBS&J with Tolbert as his supervisor there.  (Exhibit 8, Deposition of Cheek, pp. 22:5-20; Exhibit 7, Deposition of Lawson, pp. 9:4-13.)

While Cheek was working for PBS&J, Johnson introduced Deployed and Stapleton to Cheek at the huge Bonnaroo music festival in Tennessee in June 2005. (Exhibit 8, Deposition of Cheek, pp. 5:15-6:17; Exhibit 1, Deposition of Stapleton, pp.14:4-19.) Deployed was handling logistics for the festival. (Exhibit 1, Deposition of Stapleton, 14:4-19, 20:22-24.)

Approximately two weeks after the Bonnaroo meeting, Ray Hamlin ("Hamlin") of Deployed attended the Hurricane Conference in Mobile, Alabama, on behalf of Deployed. (Exhibit 1, Deposition of Stapleton, pp. 28:22-29:12.)  Johnson and Cheek also attended the same conference.  While at the conference, Hamlin met Wagner for the first time. (Exhibit 9, Deposition of Wagner, pp. 13:21-14:9.)  The meeting took place on the convention floor at Clearbrook's large exhibit.  Clearbrook was the largest exhibitor at the convention, with approximately 50,000 square feet of exhibit space, which was almost half of the total exhibit space. (Exhibit 9, Deposition of Wagner, pp.11:18.) Johnson did not have any relationship with Clearbrook or Wagner. Johnson met Wagner for the first time at the conference, although Wagner did not recall the meeting. (Exhibit 9, Deposition of Wagner, pp. 14:17-23; 21:11-20.)

The amended claim of Plaintiff appears to be that Plaintiff introduced Deployed to PBS&J through an employee of PBS&J, who in turn was also at the Mobile Hurricane Conference.   Plaintiff claims that Deployed was hired by Clearbrook because of PBS&J and, because Plaintiff introduced Deployed to PBS&J, Plaintiff became entitled to 10% of the gross of Deployed's work with Clearbrook. The reason for this theory was because

in there was no proof, as alleged in the original Complaint, that Unlimited procured the Clearbrook contract.[2]

Johnson, as corporate representative of Unlimited, made it clear that in June 2005 he did nothing to procure the August 2005 contract for Deployed. Clearbrook was awarded the contract in August and Johnson had no discussions with Clearbrook or Wagner either before or after the conference. [3]

---

[2] Plaintiff's Complaint (Doc. No. 1) sets forth the following allegation at paragraph 24: "Procurement of these contracts was only possible through the expertise, reputation, and professional contacts of Unlimited Resources, and particularly its president." This allegation is either extreme hyperbole or dishonesty regarding Plaintiff's brief one time contact with Clearbrook.

[3]
Q. In this instance involving Bruce Wagner and Clearbrook
A. Okay.
Q. – you have never met him before the conference.

A. Right.
Q. He wasn't one of your long term contacts.
A. No.
Q. He was not somebody you had worked with in the past.
A. No.
Q. He was not somebody that you had assisted in any manner.
A. No.
Q. And that's correct, is it not?
A. Yes.
Q. All right. You meet him for the first time at a conference.
A. Yeah.
Q. And he talks you around for let's say up to 30 minutes to show you what he doing.
A. Yes.
Q. During that 30 minute period, you tell him about Deployed.
A. I told him about that, because he said he was going to get involved in base camps.
Q. No problem. You tell him about Deployed during that 30 minute time.
A. How – how great they are.
Q. And you never talked to him again.
A. No.
Q. And –
A. That's why I gave it to – to Richard to follow up.
Q. And so as a result of meeting Bruce Wagner at the conference that – that Deployed themselves was at the conference, were they not.
A. Yes.
Q. And they could have met Bruce Wagner as well.
A. At – at – at my  - I  - I told Richard to have Ray Hamlin some down.
Q. But they could have met Bruce Wagner at that conference as well.  In fact, they did.

Johnson testified that other than the meeting at the Mobile Hurricane Conference, he did not have any other meetings with Wagner; that none of his other vendors had done any work or had a relationship with Clearbrook; and that Unlimited had not done any work for Clearbrook. (See Deposition of Johnson, Doc. No. 101-3, pp. 258:16-259:14.) Johnson further testified that he did not provide any written materials to Clearbrook about Deployed and that he did not set up any meetings between Deployed and Clearbrook. Unlimited did not perform any research regarding Clearbrook following the conference because they were not going to use Clearbrook. (See Deposition of Johnson, Doc. No. 101-3 at pp. 275:8-276:2.)

Following the conference, Hamlin told Stapleton that Stapleton needed to meet Wagner because there were certain Clearbrook products that may be beneficial to Deployed in its military work, particularly sewage treatment and water purification. (Exhibit 1, Deposition of Stapleton, pp. 61:14-15, 64:19-65:1.)

Stapleton arranged for an in person meeting with Wagner at Clearbrook's offices in Mobile, Alabama in August 2005. (Exhibit 1, Deposition of Stapleton, pp. 61-7-15; Exhibit 9, Deposition of Wagner, pp. 16:4-19:14.) The meeting lasted for approximately two hours. (Exhibit 1, Deposition of Stapleton, pp. 71:2-3.) No one from either PBS&J or Unlimited was present at the meeting; nor had either arranged or suggested or were

---

A.   Yeah. Yeah, they did.
Q.   And so, is it your contention that your oral agreement you entered into in 2001 means that you get 10 percent of every rental of any equipment to Bruce Wagner's Clearbrook?
A.   Yes.
Q.   And the reason for that is that you were the first person to introduce them to Bruce Wagner.
A.   Yes.
(See Deposition of Johnson, Doc. No. 101-3 at pp.236:14-238:15.)

aware of the meeting. (Exhibit 1, Deposition of Stapleton, pp. 71:20-23, 70:24-71:1.) During the meeting, Wagner and Stapleton discussed Clearbrook and Deployed's available services. Wagner discussed Clearbrook's water and sewage treatment and Deployed discussed its provision for base camps for emergency first responders (Exhibit 1, Deposition of Stapleton, pp. 71:8-12.) Wagner asked Stapleton to provide him with pricing information for base camps. (Exhibit 1, Deposition of Stapleton, pp. 73:15-74:3; Exhibit 9, Deposition of Wagner, pp.16:4-19:14). After the meeting, Deployed contacted Wagner to obtain pricing from Clearbrook for certain services for a military contract that Deployed was bidding on.[4] (Exhibit 1, Deposition of Stapleton, pp. 75:25-77:8).

At the end of August 2005, Hurricane Katrina was heading towards the Gulf Coast, including Mobile, Alabama and New Orleans, Louisiana. Clearbrook, because it was geographically located on the Gulf Coast and had just displayed its equipment, including temporary housing, at the Mobile Hurricane Conference (which was seen by many governmental officials, including FEMA), was awarded the billeting contract directly from FEMA. (Exhibit 9, Deposition of Wagner, pp. 51:17-54:9.) for Hurricane Katrina. (Exhibit 9, Affidavit of Wagner, pp. 94:1-96:4.) On August 27, 2005, Wagner contacted Stapleton directly and asked how many assets and base camps Deployed could provide. (Exhibit 1, Deposition of Stapleton, pp. 77:25-79:23, 80:7-8; Exhibit 9, Deposition of Wagner, pp. 20:11-20, 51:17-22.) Because of the work Deployed did for the first responders camp, Deployed performed other work as a subcontractor to Clearbrook for

---

[4] Deployed had been providing base camp services to the military, including the national guard, similar to those it provides for emergency disaster relief. (Exhibit 1, Deposition of Stapleton, pp. 68:20-22.) Deployed also provided those same services for the Bonnaroo music festival. Deployed was providing base camps well before it ever met Johnson.

Hurricane Katrina. (See Affidavit of Wagner, Doc. No. 101-13 at ¶10-11 and Affidavit of Stapleton, Doc. No. 101-11 at ¶12-13.)

Wagner contacted Stapleton directly and hired Deployed as a sub-contractor to provide base camps for first responders[5]. (Exhibit 1, Deposition of Stapleton, pp. 77:25-79:23, 80:7-8; Exhibit 9, Deposition of Wagner, pp. 20:11-20, 51:17-22; Affidavit of Stapleton, Doc. No. 101-11, ¶12; April 15, 2009 Affidavit of Wagner, Doc. No. 101-13, ¶10-11.) The reason Clearbrook hired Deployed was the result of a meeting between only Deployed and Clearbrook that occurred at Clearbrook's offices shortly before Hurricane Katrina. (See Affidavit of Wagner, Doc. No. 101-13 at ¶9 and Affidavit of Stapleton, Doc. No. 101-11 at ¶14.) Plaintiff is not entitled to payment from Deployed for work Deployed performed for Clearbrook. Deployed was not hired by PBS&J to work for Clearbrook for Hurricane Katrina or by Unlimited. (Exhibit 9, Deposition of Wagner, pp. 57:18-58:3, 60:12-62:7; Exhibit 7, Deposition of Lawson, pp. 31:5-14, 32:13-33:5.) Neither Unlimited nor PBSJ provided a scintilla of effort in obtaining the subcontract between Deployed and Clearbrook. (Exhibit 8, Deposition of Cheek, pp. 75:10-76:15.) Clearbrook decided on Deployed based on the August meeting. (April 15, 2009 Affidavit of Wagner, Doc. No. 101-13, ¶8-9

### PBS&J and Clearbrook.

Plaintiff's total lack of evidence that it performed any work to arrange for the Clearbrook and Deployed subcontract caused Plaintiff to abandon its original theory of

---

[5] Deployed provides base camps for the emergency first responders. Deployed does not provide temporary housing for persons displaced by the hurricane, which is set up well after the base camps for the first responders. Wagner, through its partner COGIM, could provide the temporary housing.

procurement of Clearbrook and substituted a theory of corruption of intrigue involving

PBS&J and Clearbrook.[6]

        Plaintiff contends that Clearbrook was simply a front for PBS&J for the

Hurricane Katrina contract. Moreover, Tolbert, (an alleged longtime friend of Johnson)

now deceased, improperly and unlawfully used his contacts with FEMA to cause FEMA to

award the Hurricane Katrina contract to Clearbrook because PBS&J could not obtain that

work[7] Plaintiff further alleges that Deployed obtained the Hurricane Katrina contract with

Clearbrook because of PBS&J and Plaintiff introduced Deployed to PBS&J. (See

Amended Complaint, Doc. No. 105.) Clearbrook hired Deployed as a subcontractor.

(Exhibit 8, Deposition of Cheek, pp. 62:23-25; April 15, 2009 Affidavit of Wagner, Doc.

No. 101-13, ¶10-11.) Deployed was never part of any consortium or team that allegedly

obtained the FEMA contract. (Exhibit 10, June 10, 2009 Affidavit of Wagner, ¶5-6.)

        Plaintiff's allegations are not supported by the evidence. There is no evidence to

support that Clearbrook was a front for PBS&J.. (See Exhibit 7, Deposition of Lawson, at

pp. 91:19-92:13.)   Deployed's contract with Clearbrook was not obtained by Unlimited

or through PBS&J. (See Affidavit of Stapleton, Doc. No. 101-11 at ¶9 and Affidavit of

Wagner, Doc. No. 101-13 at ¶8-9.) There is no evidence that PBS&J hired Deployed to

act as a subcontractor for Clearbrook; or that Clearbrook hired Deployed because of

PBS&J; or that PBS&J hired Deployed through Clearbook. In fact, the Affidavit of

Wagner is clear: "In other words, PBS&J had nothing to do with Clearbrook hiring

---

[6] None of Plaintiff's allegations to date have implicated Deployed in the sinister plan devised by Plaintiff after reading a newspaper article that was never confirmed and which was specifically denied by both PBS&J and Clearbrook as discussed infra. Plaintiff only inisits that the purpose of this plan was to deny Plaintiff payment from Deployed on a non-existent contract.
[7] Scott Lawson, PBS&J corporate representative testified that PBS&J could bid on that work contrary to the unsupported bare allegation of Plaintiff to the contrary. (Lawson deposition at p. 92:1-13

Deployed Resources, LLC as a subcontractor for Clearbrook with Hurricane Katrina."
(See June 10, 2009 Affidavit of Wagner, attached hereto as Exhibit 10.)     On August 27,
2005, Wagner contacted Stapleton directly and asked how many assets and base camps
Deployed could provide. (Exhibit 1, Deposition of Stapleton, pp. 77:25-79:23, 80:7-8;
Exhibit 9, Deposition of Wagner, pp. 20:11-20, 51:17-22.)     Because of the work
Deployed did for the first responders camp, Deployed performed other work as a
subcontractor to Clearbrook for Hurricane Katrina. (See Affidavit of Wagner, Doc. No.
101-13 at ¶10-11 and Affidavit of Stapleton, Doc. No. 101-11 at ¶12-13.)

**There is no fronting relationship between Clearbrook and PBS&J.**

After Hurricane Katrina, an unsupported allegation arose that Clearbrook was
using PBS&J to obtain the FEMA Hurricane Katrina contracts.  Several newspaper
articles suggested that Tolbert, who used to work for FEMA before working for PBS&J,
used his old contacts at FEMA to get the Hurricane Katrina contract awarded to
Clearbrook.  The newspaper articles attempted to tie in the business relationship between
Clearbrook, COGIM and PBS&J to show that Tolbert was assisting Clearbrook to obtain
the contract[8].

Curiously, Plaintiff only relied on newspaper articles rather than provide the
actual emails in which Tolbert refuted those allegations in response to questions posed by
the same newspaper reporter that Plaintiff relied upon. (See Exhibit 14)

---

[8] Prior to Hurricane Katrina, Clearbrook and PBS&J entered into an agreement
regarding COGIM housing units.  Clearbrook had a business relationship with COGIM,
an Italian company, who provided temporary housing.  These housing units were used by
the federal government in Iraq.  The COGIM units had not been used in the United States
and Clearbrook, COGIM and PBS&J in July 2005 entered into an agreement, whereby
they would work to sell the COGIM units in the United States. (See Exhibit 14, Teaming
Agreement.)

PBS&J acted as a subcontractor to Clearbrook for Clearbrook's contract with FEMA and supplied Clearbrook six to seven PBS&J employees as a subcontractor to perform administrative work for Clearbrook. (See Exhibit 13, Professional Services Agreement, Exhibit 1, Deposition of Stapleton, pp. 107:19-20; Exhibit 8, Deposition of Cheek, pp. 64:6-13, 55:2-8, 13-16, 55:23-56:1; Exhibit 7, Deposition of Lawson, pp. 40-20-41:6, 55:21-56:8, 44:10-14; Exhibit 9, Deposition of Wagner, 71:17-20.) PBS&J acted as a subcontractor to Clearbrook and earned approximately $167,411.13 for work performed. PBS&J was paid an additional $263,000 for the COGIM units. (See Exhibit 15.)  That was the extent of the payments received by PBS&J from Clearbrook .

PBS&J, after Clearbrook was awarded the FEMA contract, also advanced money under its prior agreement with Clearbrook and COGIM to bring the COGIM housing units to the United States as FEMA ordered 180 units for Hurricane Katrina.  (Exhibit 7, Deposition of Lawson, 25:6-17, 26:1-24, 37:6-12, 39:1-13, 47:21-25, 71:14-25.)

When the deposition was taken on April 6, 2009 of Lawson, as corporate representative of PBS&J, Lawson testified that: (1) there was no fronting arrangement with Clearbrook; (2) PBS&J could have bid on the FEMA contract and (3) there was no "hidden relationship" involving Deployed. (See Exhibit 7, Deposition of Lawson, pp. 40:17-19, 42:7-16, 91:19-92:13, 92:20-22.)

According to Lawson, the Hurricane Katrina contract was Clearbrook's contract. (Exhibit 7, Deposition of Lawson, pp. 40:17-19, 42:7-16, 91:19-92:13, 92:20-22.)  It was awarded by FEMA to Clearbrook without any assistance of PBS&J.   According to Tolbert's email: "The contract is between Clearbrook and FEMA.  I am not an agent of Clearbrook...." (Exhibit 15.)

It is undisputed that Clearbrook hired Deployed directly, without any involvement by PBS&J. There is no evidence that Clearbrook hired Deployed because of PBS&J.

## II. OVERVIEW OF THE MATERIAL FACTS.

### a.    The Relationship between Unlimited and Deployed.

Johnson, testified that Unlimited entered into an oral agreement with Stapleton in September 2001 and that the oral agreement was never changed by Deployed or Unlimited from 2001 through the filing of this litigation. (Deposition of Johnson, Doc. No. 101-2, pp. 13:2-19; 14:22-15:2 (changed by errata sheet "There were not multiple oral agreements; rather, there was but one Agreement, as between the parties, which, in turn, was reflected and supplemented by writings and dealings"), 106:23-25, 107:11-18, 25, 108:1-25, 109:1-8.)

> Q. Okay. And from 2001 all that way through 2006, you never had another conversation with Rich Stapleton regarding the agreement.
> A. No, because – because as far as I was concerned, everything was great. (Deposition of Johnson, Doc. No. 101-2, pp. 61:19-23.)

Johnson testified that the agreement between the parties was for 10% of the rentals:

> A. Most of the payments I got from Deployed was for – for rental of equipment and – and didn't cover manpower or – or the employees or – or the gas or the transportation.
> Q. And that was the deal.
> A. Yeah, that's the deal,
> Q. So it's not 10 percent of the gross, but 10 percent of the rental of the equipment,
> A. Yes.

Q.   Okay. So when we go back to that October of 2001 agreement, the agreement was that Deployed would pay you 10 percent of the rental of equipment,

A.   Yes.

Q.   And they agreed to pay it to you whether it was on their own equipment or on equipment that they rented from others.

A.   Right,

Q.   That was the deal.

A.   That was the deal.

Q.   And they would do it on a job-by-job basis.

A.   Yeah. As long as it's covered in the contract, yeah.

Q.   If you brought the deal to them

A.   Yeah.

Q.   then they would pay you 10 percent of the rental of the equipment on a job by job basis.

A.   Ten percent of the gross on –

Q.   of the rental – of the gross rental –

A.   Yeah.

Q.   – of the equipment.

A.   Equipment, yeah.

Q.   It wasn't based on all those other items of what they earned or how they earned it on other – didn't include, for example, training. You didn't get 10 percent of the training.

A.   No.

Q.   It was on the rental of equipment.

A.   Yes.

Q.   As long as you brought the deal to them, the contract to them, they continued to pay you 10 percent of the rental of equipment.

A.   Yeah. (Deposition of Johnson, Doc. No. 101-3, pp. 216:8-218:18.)

The business relationship between Unlimited and Deployed ended on October 3, 2006. (See Affidavit of Stapleton, Doc. No. 101-11 at ¶5.) During the relationship, Unlimited was paid, as agreed, for every contract which it procured for Deployed.[10]

Unlimited procured contracts from Comfort Zone, Garner, the FL-DEM and FL-DOH. Over the course of the relationship, Deployed paid $366,562.00 to Unlimited. (Exhibit

---

[10] Although Johnson testified that the payment from Deployed was to be on rentals of equipment his testimony has been "enhanced" by recent pleadings filed by his counsel. Nevertheless, even with enhanced testimony, there is no material issue of fact about Unlimited being paid $366,562.00 by Deployed and Unlimited agreeing to those payments until August 2006.

"2" to the Affidavit of Stapleton, Doc. No. 101-11.) Unlimited agreed to those payments. (See Affidavit of Stapleton, Doc. No. 101-11 at ¶6.)

In support of its allegations set forth in its original Complaint and because of not having any signed agreement, Plaintiff coined the phrase "oral/written" contract. According to Johnson, even though neither party signed a written agreement they are nevertheless required to pay Unlimited because of an "oral/written" contract whose terms are changed from time to time.[11]

> A.  He didn't – he didn't say anything, I mean, and as far as I'm concerned, it was a written, oral/written contract.
> Q.  It was a written/oral contract?
> A.  I mean, as far as I'm concerned, it was a contract that we kept on doing business on.  We did a lot of- I did a lot of business with Richard Stapleton.
> Q.  But – but – but – but he didn't agree to any of the changes in the – in the—
> A.  He didn't say nothing negative about it.  (Deposition of Johnson, Doc. No. 101-3 at pp. 169:12-23.)

Plaintiff has been unable to set forth the terms of the contract between the Parties. There has not been any meeting of the minds.  As a result, Plaintiff cannot state any breach of a non existent contract.   See *Greater N.Y. Corp. v. Cenvill Miami Beach Corp.*, 620 So. 2d 1068, 1070 (Fla. Dist. Ct. App. 3d Dist. 1993), "It is well established that a meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract… Since there was no meeting of the minds as to this essential and substantial element of the alleged oral termination/modification agreement, it cannot be binding on the parties. *Cohen v. Amerifirst Bank*, 537 So. 2d 1108, 1110 (Fla. 3d DCA), review denied, 547 So. 2d 1209 (Fla. 1989)."

---

[11] Deposition of Johnson (Doc. No. 101-2), pp. 57:10-13, 158:18-21 (changed by errata), 165:17-25, 166:23-25, 167:1-12, 168:5-21, 172:20-25, 173:1-24, 174:6-24. These are just a few of the pages where Johnson testified that the various "unsigned written agreements" were changed from time to time but were part of the "oral/written" agreement, even though Deployed never agreed to any written agreement.

In *State v. Family Bank of Hallandale*, 623 So. 2d 474 (Fla. 1993), the Court stated: the acceptance of an offer, to result in a contract, must be: (1) absolute and unconditional; (2) identical with the terms of the offer; and (3) in the mode, at the place, and within the time expressly or impliedly required by the offer. If a person offers to do a definite thing, and the person to whom the offer is made accepts conditionally, or introduces a new term into the acceptance, his answer is not an acceptance; but it is either a mere expression of willingness to that, or it is in effect a counter offer, which must be accepted or assented to before a contract can result. *Glosser v. Vasquez*, 898 So. 2d 1179, 1181 (Fla. Dist. Ct. App. 3d Dist. 2005). The creation of a contract requires that there be a mutual or reciprocal assent to a certain and definite proposition, which is commonly referred to as a "meeting of the minds." *Hewitt v. Price*, 222 So. 2d 247 (Fla. 3d DCA 1969). There is no meeting of the minds between the parties when essential terms are left open for consideration or negotiation. *Webster Lumber Co. v. Lincoln*, 94 Fla. 1097, 115 So. 498, 502 (Fla. 1927). Thus, to create a contract and trigger contractual obligations, the parties must have a definite and distinct understanding, without which there is no assent and no contract. *Webster Lumber Co. v. Lincoln, supra; Enid Corp. v. Mills,* 101 So. 2d 906 (Fla. 3d DCA 1958).

Moreover, Plaintiff is unable to produce any evidence of any contract which it procured on behalf of Deployed for which it has not been paid.  Plaintiff's corporate representative could not testify as to a single contract that Unlimited procured for Defendant:

> Q.  What lucrative emergency disaster contracts did Unlimited Resources obtain for Deployed?
> A.  I refer that to my – my attorney too.
> Q.  You can't tell me any?

A. I would refer it to him.
Q. Can you do – can you tell me any without referring to him?
A. No, not – no  (See Deposition of Johnson, Doc. No. 101-2 at pp. 120:23-5.)

Q. So I'm asking you, did you – did you procure a single FEMA contract for Deployed?
A. I refer to my attorney on that one.
Q. You don't have any facts today to help me with that?
A. No.  (See Deposition of Johnson, Doc. No. 101-3 at pp. 319:7-320:19.)

Q. From 2004 to 2006, did you procure any contracts for Deployed Resources?
A. Mainly, I had to go look at my records.  I don't answer something I don't know.  I would have to look at my records.
Q. You can't tell me right now without that?
A. I would – I would refer that to my attorney. I don't have an answer.[12]  (See Deposition of Johnson, Doc. No. 101-4 at pp. 365:4-11.)

There are several ways to look at the procurement under Federal and Florida law.

Most commonly, one looks at the definition of procurement. The definition of procure as

set forth in MIRIAM WEBSTER'S DICTIONARY is **"to obtain by effort"**.  (Emphasis

supplied.)

An example of this is in the field of real estate brokers, where the brokers are to

receive a percentage of a sale procured by the broker. The court has found that to earn a

commission, a broker must perform certain tasks:  "initiate negotiations by doing some

affirmative act to bring buyer and seller together." *Ehringer v. Brookfield & Assocs.*, 415

So. 2d 774, 775-776 (Fla. 5th DCA 1982).  Second, the broker must remain "involved in

the continuing negotiations between the seller and the buyer," unless "the seller and

buyer intentionally exclude the broker from negotiations." *Siegel v. Landquest Inc.*, 761

---

[12] This testimony was elicited from Johnson in Volume III of his deposition, after he had more than ample opportunity to review his records, and, in fact, Unlimited should have produced such records pursuant to Rule 26.  None were produced because none exist.

So. 2d. 415, 417 (Fla. 5th DCA 2000) citing to *Sculer v. Allen*, 76 So. 2d 879, 883 (Fla. 1955), and *Sheldon Greene v. Rosinda Inv., N.V.*, 475 So.2d 925, 927 (Fla. 3d DCA 1985). See *Rotemi Realty v. Act Realty Company*, 911 So. 2d 1181 (Fla. 2005). See also *National Airlines, Inc. v. Dooly Associates, Inc.*, 160 So.2d 53 (Fla. 3rd DCA, 1964). In the case of a broker trying to secure a commission based on alleged procurement of a real estate sale, the court ruled that the broker had procured the sale since he brought the property to the attention of the purchaser, brought the parties together, and attempted to promote the sale through correspondence with the parties. Id. "Whether a broker is a procuring cause of a sale depends upon the facts and circumstances surrounding ... each particular case. To be the procuring cause the broker must show that he called the potential purchaser's attention to the property and it was through his efforts the sale was consummated." Id. at 54.

### c.    The PBS&J Contracts.

In 2006, PBS&J formed the Disaster Solution Alliance ("DSA"), which was just nomenclature for PBS&J. PBS&J used the name DSA for the particular federal project, the IA TAC, which PBS&J was bidding on. (See Exhibit 7, Deposition of Lawson at pp. 93:1-9.) Deployed was one of PBS&J's eleven subcontractors for the IA TAC project. (See Affidavit of Stapleton, Doc. No. 101-11 at ¶18.) Although the press release for the DSA uses the term "our partners," the subcontractors listed on the press release were not partners with PBS&J; the term "partners" refers to teaming partners, not a partner is the sense of one who will share in the profits. Lawson said it in his deposition that "[t]he

---

[15] Since Plaintiff has failed to set forth any valid agreement between the Parties, this Court should grant summary judgment as to the entire case.

term partner was not unusual in the disaster relief arena." (See Exhibit 7, Deposition of

Lawson at pp. 96:19-97:10, and Press Release attached as Exhibit "4" to the Affidavit of

Stapleton, Doc. No. 101-11.)

      PBS&J was awarded the IA TAC project. (See Exhibit 7, Deposition of Lawson,

at pp. 90:2-10.) Deployed attended two training sessions under the IA TAC project and

was paid $11,228.38. (See Affidavit of Stapleton, Doc. No. 101-11 at ¶17, Exhibit 1,

Deposition of Stapleton, pp. 155:2-156:1.) Other than attending two training sessions,

Deployed did not perform any subcontractor work for the IA TAC project. (See

Affidavit of Stapleton, Doc. No. 101-11 at ¶18, Exhibit 7, Deposition of Lawson, 90:9-

24.)

      Deployed was a subcontractor to PBS&J on two other projects prior to the

termination of Deployed's relationship with Unlimited. (See Affidavit of Stapleton, Doc.

No. 101-11 at ¶19.) The projects were Wrightsville Beach and National Rural Electrical

Coop. Assoc. Deployed did not perform any work for PBS&J for either of those

contracts. (See Affidavit of Stapleton, Doc. No. 101-11 at ¶19 and Exhibit 7, Deposition

of Lawosn, pp. 90:2-10.)

      Other than payment of $11,228.38 for the two training sessions, Deployed has not

received any moneys from PBS&J nor has Deployed performed any work for PBS&J.

(See Affidavit of Stapleton, Doc. No. 101-11 at ¶17-18.) Even if a jury found that

Plaintiff had "procured" the contracts from PBS&J for Deployed, Deployed has not

performed any work for PBS&J, so Plaintiff would not receive any payment as no

moneys were earned.

    **d.**    **The Agreement Between the Parties Does not Provide for An Accounting.**

Plaintiff's corporate representative, Johnson, testified that the oral agreement between the parties did not provide for an accounting:

> Q. And you've already mentioned to me that the request for an accounting was not discussed in the oral agreement.
> A. The – I –I would  - I would say I went over that whole contract with him over the-
> Q. The unrestricted right to request an accounting for the income received was not discussed in the oral agreement, was your testimony earlier.  Are you changing that?
> Mr. Nicholas.  Objection to form.  You can answer.  He's asking whether the accounting was part of the
> Q. The oral agreement,
> A. No, it was not.  (See Deposition of Johnson, Doc. No. 101-2 at pp. 109:10-24.)
>
> Q. So there was nothing in the oral agreement that agreed to a full accounting; is that correct?
> A. Yes. **Changed testimony "There was a requirement of accounting in the Agreement"**  (See Deposition of Johnson, Doc. No. 101-2 at pp. 122:22-24.)

## III.    SUMMARY JUDGMENT SHOULD BE GRANTED.

### a.  Summary Judgment is an Appropriate Remedy.

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  See Fed. R.Civ.P., Rule 56(c). "The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact.'"  *Cohen v. United Am. Bank of Cent.Fla.*, 83 F.3d 1347,

1349 (11th Cir. 1996)(quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994), *cert.denied*, 513 U.S. 1110 (1995(). "There is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349. The court considers the evidence and all inferences drawn therefrom in the light most favorable to the non-moving party. See *Hairston v. Gainesvillw Sun Pub. Co.*, 9 F.3d. 913, 918 (11th Cir. 1993), *reh'g and reh'g en banc denied*, 16 F.3d 1233 (11th Cir. 1994).

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an intregral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'…Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis" *Celotex Corp v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986) *quoting* Fed. R.Civ. P. 11, in part

Defendant does not bear the burden of persuasion at trial:

> If the summary judgment movant does not bear the burden of persuasion at trial, the movant's burden to show presumptive entitlement to summary judgment is satisfied if the movant points to the absence of any factual support for an essential element of plaintiff's claim. If the movant makes this showing, an opposing party that bears the burden of persuasion must respond by setting out specific facts showing a genuine issue that requires trial." See *Celotex Corp v. Catrett*, *supra*.

When a moving party shows the absence of factual support for an essential element of a claim, the burden shifts to the non-movant to refute the movant's contentions or to

introduce by affidavit or other means evidentiary support for the element of the claim in question or other matter that would support a decision for non-movant. See *Celotex Corp v. Catrett*, supra.

The role of summary judgment is to "pierce the boilerplate of the pleading and assay the parties' proof in order to determine whether trial is actually required." See *Wynee v. Tufts Univ. School of Medicine*, 976 F.2d 791, 794 (1st Cir. 1992).

Pursuant to Rule 56(c) Deployed has demonstrated that there is no genuine issue as to any material fact, there is no evidence to support Plaintiff's claims and Deployed is entitled to judgment as a matter of law.

### b.   Partial Summary Judgment.

If the Court determines that it cannot render summary judgment as to the entire action[15], Defendant requests that the Court determine pursuant to Fed.R.Civ.P., Rule 56(d)(1), which material facts are not genuinely at issue and issue an order detailing those facts so that those facts are established and the issues are removed from trial of this matter. Rule 56 (d)(1) provides:

> If summary judgment is not rendered on the whole action, the court should…determine what material facts are genuinely not at issue. It should then issue an order specifying what facts – including items of damages or other relief—are not genuinely at issue. The facts so specified must be treated as established in the action.

In this instance, grounds exist for the granting of partial summary judgment on the issue of whether Plaintiff procured the Hurricane Katrina contracts from Clearbrook on behalf of Deployed, whether PBS&J was simply a front for Clearbrook, what moneys, if any, Deployed obtained from any contracts with PBS&J, and what percentage, if any, Plaintiff is entitled to under its agreement with Deployed.

### V.    CONCLUSION.

For the reasons set forth above, Defendant Deployed Resources, LLC's Motion

for Summary Judgment should be granted.    Final judgment should be entered in favor of

Defendant and against Plaintiff, providing that the Plaintiff Unlimited Resources

Incorporated takes nothing on its claims against Defendant.  In the event this Court does

not grant Defendant, Deployed Resources, LLC's Motion for Summary Judgment, partial

summary judgment should be granted as to the claims involving Clearbrook

<div style="margin-left: 50%;">

RUMRELL, COSTABEL, WARRINGTON
& BROCK, LLP

*/s/ Richard G. Rumrell*

Richard G. Rumrell
Fla. Bar No.: 132410
Email: rumrell@rumrelllaw.com
9995 Gate Parkway North, Suite 190
Jacksonville, FL  32246
Phone:    (904) 996-1100
Facsimile:  (904) 996-1120
**Trial Counsel for Defendant
DEPLOYED RESOURCES, LLC**

</div>

### CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2009, I electronically transmitted the attached
documents to the Clerk's Office using the ECF System for filing. I understand that notice
of this filing will be sent to all parties by operation of the Court's electronic filing system.
Parties may access this filing through the Court's system.

<div style="margin-left: 40%;">

*/s/ Richard G. Rumrell*

</div>