1

1       IN THE UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
2               JACKSONVILLE DIVISION

3

4    UNLIMITED RESOURCES INCORPORATED,
     a Florida corporation,
5
            Plaintiff,
6
                            CASE NO: 3:07-CV-961-J-12MCR
     vs.
7
     DEPLOYED RESOURCES, LLC., a
8    foreign limited liability company,

9           Defendant.

10   * * * * * * * * * * * * * * * * * * * * * * *

11   PROCEEDINGS:       Videotaped Deposition of
                        RICHARD STAPLETON
12
     DATE:              Tuesday, April 7, 2009
13
     TIME:              10:25 a.m. - 5:08 p.m.
14
     PLACE:             1510 N. Ponce de Leon Blvd.
15                      St. Augustine, FL

16   REPORTED BY:       Catherine A. Ardito, RPR-CP
                        Court Reporter and Notary
17                      Public, State of Florida

18   VIDEOGRAPHER:      Lauren Jones, St. Augustine
                        Litigation Video
19

20   * * * * * * * * * * * * * * * * * * * * * * *

21            VOLUME I - PAGES 1-120

22
            ST. AUGUSTINE COURT REPORTERS
23        1510 NORTH PONCE de LEON BOULEVARD
            ST. AUGUSTINE, FLORIDA 32084
24                 (904) 825-0570

25

COPY

EXHIBIT
1

2

```
 1                         APPEARANCES

 2    REPRESENTING THE PLAINTIFF:

 3

 4        DANIEL A. NICHOLAS, ESQUIRE
          Rissman, Barrett, Hurt, Donahue & McLain, P.A.
 5        One North Dale Mabry Highway
          11th Floor
 6        Tampa, FL 33609
          (813) 221-3114
 7
      REPRESENTING THE DEFENDANT:
 8
          RICHARD G. RUMRELL, ESQUIRE
 9        Rumrell, Costabel, Warrington & Brock, LLP
          9995 Gate Parkway Drive North
10        Suite 190
          Jacksonville, FL 32246
11        (904) 996-1100

12    ALSO PRESENT:

13        MR. JOHN LEVCHUK

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2                                        PAGE

 3   WITNESS/EXAMINATION:

 4   RICHARD STAPLETON

 5     DIRECT EXAMINATION                    6
       BY MR. NICHOLAS
 6
       CROSS-EXAMINATION                   205
 7     BY MR. RUMRELL

 8   ERRATA SHEET                          207

 9   CERTIFICATE OF REPORTER              209

10

11                    EXHIBITS

12
```

```
13   Exhibit 1, 4/2/05 Series of E-Mails    18
     Exhibit 2, 4/27/05 Series of           19
14   E-Mails
     Exhibit 3, 5/9/05 Series of E-Mails    19
15
     Exhibit 4, 6/9/05 Series of E-Mails    22
16   Exhibit 5, Technical Cost Proposal     27
     Exhibit 6, Meeting Agenda              30
17   Exhibit 7, Vendor Ledgers              47
     Exhibit 8, 8/30/06 Letter from         49
18   Unlimited Resources via E-Mail
     Exhibit 9, 4/25/06 Letter from         81
19   Deployed Resources, LLC
     Exhibit 10, Clearbrook, LLC,           84
20   Statement of Account
     Exhibit 11, Deployed Resources,        86
21   LLC, Income Statement
     Exhibit 12, Standard Form 1449         92
22   Exhibit 11-C, Deployed Resources       92
     2005-2006 Consolidated Income
23   Statement
     Exhibit 13, 11/8/05 Letter from        95
24   Deployed Resources

25
```

4

1                    EXHIBITS (Continued)

2                                              <u>PAGE</u>

3

4        Exhibit 14, Order for Supplies or      101
5        Services                               105
         Exhibit 15, 10/9/05 E-Mails
6        Exhibit 16, 10/11/05 E-Mail            108
         Exhibit 17, 10/13/05 E-Mail            109
7        Exhibit 18, Press Release              113
         Exhibit 19, Deployed Services          115
8        Client List
         Exhibit 20, Solicitation for Offers    117
9        Exhibit 21, 8/15/06 Letter from the    118
         State of Louisiana, Office of State
10       Purchasing
         Exhibit 22, Solicitation for Offers    119
11       for Emergency Contingency Base
         Camps
12       Exhibit 23, 7/17/06 E-Mail             133
         Exhibit 24, 8/2/06 E-Mail              134
13       Exhibit 25, 4/29/08 Renewal            136
         Notification, State of Louisiana
14       Exhibit 26, 6/11/07 Memorandum from    142
         the North Carolina Department of
15       Administration
         Exhibit 27, Deployed Resources         143
16       Technical Proposal

17

18

19

20

21

22

23

24

25

5

<pre>
 1                     P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  This is the videotaped

 3      deposition of Richard Stapleton taken at 1510 North

 4      Ponce de Leon Boulevard, St. Augustine, Florida on

 5      April 7th, 2009.  We are on the record at 10:25.

 6              The United States District Court Middle

 7      District of Florida, Jacksonville Division, Case

 8      Number 3:07-CCV-961-J-12MCR, Unlimited Resources

 9      Incorporated, a Florida corporation, Plaintiff,

10      versus Deployed Resources, LLC, a foreign limited

11      liability company.

12              Representing the Plaintiff.

13          MR. NICHOLAS:  Dan Nicholas.

14              THE VIDEOGRAPHER:  Representing the

15      Defendants.

16          MR. RUMRELL:  My name is Rick Rumrell with

17      the Law Firm of Rumrell, Costabel, Warrington &

18      Brock, and we're here representing the Defendant,

19      Deployed Resources.

20              THE VIDEOGRAPHER:  Thank you.  Also present

21      today.

22          MR. LEVCHUK:  John Levchuk, for Unlimited

23      Resources.

24          MR. NICHOLAS:  Spell your last name, John.

25          MR. LEVCHUK:  L-E-V, as in Victor, C-H-U-K.
</pre>

1          THE VIDEOGRAPHER:  Thank you.  Your court

2      reporter today is Cathy Ardito with St. Augustine

3      Court Reporters.  Your videographer is Lauren Jones

4      with St. Augustine Litigation Video.

5          Madam Court Reporter, will you please swear

6      in the witness.

7                  RICHARD STAPLETON,

8  having been duly sworn, was examined and testified as

9  follows:

10         THE WITNESS:  I do.

11         THE VIDEOGRAPHER:  Your water bottle's in

12     the shot.  I'm sorry.

13         Thank you.

14         MR. NICHOLAS:  Ready?

15                  DIRECT EXAMINATION

16  BY MR. NICHOLAS:

17     Q.  Good morning, Mr. Stapleton.  How are you?

18     A.  Good morning.

19     Q.  Your name is Richard Stapleton, correct?

20     A.  Yes.

21     Q.  And you're the designated representative of

22  Deployed Resources?

23     A.  Yes.

24     Q.  Okay.  Before Hurricane Katrina, could you

25  describe for me all emergency work ever performed by

1    Deployed?

2      A.  We worked at 9/11 and we worked at multiple

3    hurricanes in 2004.

4      Q.  What did you do at 9/11?

5      A.  We provided office trailers and power --

6    temporary power equipment and rest rooms.

7      Q.  Who did you provide that for?

8      A.  Garner Environmental.

9      Q.  And your testimony is you provided trailers?

10     A.  Office trailers.

11     Q.  Anything else?

12     A.  Power generators and portable water tankers.

13     Q.  Is there a particular person at Garner you worked

14    with?

15     A.  We worked for Kenny Hayes.  He was the project

16    manager.

17     Q.  Did you do anything else for Garner?

18     A.  No.

19     Q.  Okay.  Tell me any other work you performed prior

20    to Hurricane Katrina that's emergency disaster related.

21     A.  We provided showers for the 2004 hurricanes.

22     Q.  Who did you provide that for?

23     A.  Comfort Zone Portables.

24     Q.  What were the hurricanes of 2004?

25     A.  Can you repeat the question?

8

1      Q.  Sure.  What were the hurricanes you provided the

2  showers for in 2004, their names?

3      A.  Hurricane Charlie, Francis, Jeanne, and Ivan.

4      Q.  And did you provide any other emergency disaster

5  work before Hurricane Katrina?

6      A.  I don't recall.

7      Q.  Okay.  Did you ever -- did Deployed ever provide

8  any emergency base camp services prior to Hurricane

9  Katrina?

10     A.  No.

11     Q.  Has Deployed ever done any work for the State of

12  Florida prior to Hurricane Katrina?

13              MR. RUMELL:  Before Hurricane Katrina?

14              THE WITNESS:  Yes.

15  BY MR. NICHOLAS:

16     Q.  Is your answer "yes?"

17     A.  Yes.

18     Q.  And what was that work?

19     A.  We provided rental equipment to Florida

20  Department of Health and we had submitted -- Florida

21  Department of Health.

22     Q.  Is that in connection with Comfort Zone?

23     A.  No.

24     Q.  Describe that work for me.

25     A.  That was work that was sourced by Unlimited

9

1    Resources.  It was rental of cots -- sleeping cots and

2    water tankers.

3        Q.  Was Garner sourced by Unlimited Resources?

4        A.  Before 2001, yes.

5        Q.  Was Comfort Zone sourced by Unlimited Resources?

6        A.  Yes.

7        Q.  Before Hurricane Katrina, could you describe any

8    work you did for FEMA?

9        A.  We didn't do any work for FEMA.

10       Q.  Okay.  Before Hurricane Katrina, can you describe

11   any work you did for the State of Louisiana?

12       A.  Can you repeat the question?

13       Q.  Sure.  Before Hurricane Katrina, can you describe

14   for me all work you performed for the State of

15   Louisiana?

16       A.  We never worked for Louisiana.

17       Q.  Okay.  Prior to Hurricane Katrina, did you

18   perform any work for the State of Mississippi?

19       A.  Yes, we did.

20       Q.  And what was that work?

21       A.  That was a military contract.

22       Q.  Was that in connection with a base?

23       A.  Yes.

24       Q.  What was the base?

25       A.  Camp Shelby.

1    Q.  What did you do at the base?

2    A.  We provided water stations and delivered potable

3  water.

4    Q.  Before Hurricane Katrina, did you perform any

5  work in Alabama?

6    A.  No.

7    Q.  Have we covered all emergency disaster work you

8  performed before Hurricane Katrina?

9            MR. RUMRELL:  Object to the form.

10    A.  I don't recall.

11    Q.  Okay.  Is there any that you haven't disclosed to

12  me?

13            MR. RUMRELL:  Object to the form.

14    A.  I don't recall.

15    Q.  Okay.  We have 9/11 in connection with Garner,

16  correct?

17    A.  Correct.

18    Q.  Okay.  We have the Comfort Zone showers, correct?

19    A.  Correct.

20    Q.  Okay.  And we have the Florida Department of

21  Health, correct?

22    A.  Correct.

23    Q.  Anything else?

24    A.  Not that I recall.

25    Q.  Okay.  So, prior to Hurricane Katrina, all the

1   emergency disaster work you -- Deployed performed --

2   A.   There was one more hurricane with Comfort Zone,

3   Hurricane Dennis --

4   Q.   Okay.

5   A.   -- in early 2005.

6   Q.   What did you do for that?

7   A.   Provided showers to Comfort Zone.

8   Q.   Who was the procuring source for that?

9   A.   That was credited -- that was a similar -- the

10  procuring company was Unlimited Resources Incorporated.

11  Q.   Can you identify any emergency work before two

12  thousand -- I'm sorry.  Strike that.

13       Before Hurricane Katrina, you can you identify

14  any emergency work that you procured without Chuck

15  Johnson's assistance?

16  A.   No, I cannot.

17  Q.   Is it your testimony that you have paid Chuck

18  Johnson for all that procurement?

19  A.   Yes, it is.

20  Q.   Prior to Hurricane Katrina, did you have any

21  personal relationships with anyone at FEMA?

22  A.   No, I did not.

23  Q.   Prior to Hurricane Katrina, did you have any

24  personal relationships with anyone in the State of

25  Florida, in terms of agency officials?

1          MR. RUMRELL:   Katrina?

2     A.   Yes.

3     Q.   And who was that?

4     A.   That was Charles Hagan.

5     Q.   How did you know him?

6     A.   We met him through Chuck Johnson.

7     Q.   Anybody else?

8     A.   None -- there were some people that had inspected

9   work.  I don't recall their names.

10    Q.   Okay.  Before Hurricane Katrina, did you have any

11  personal relationships with anyone in the State of

12  Louisiana?

13         MR. RUMRELL:  Asked and answered.  Object to

14    the form.

15    A.   Not that I know of.

16    Q.   Okay.  Prior to Hurricane Katrina, has -- had

17  Deployed ever submitted any type of proposals to FEMA?

18         MR. RUMRELL:  Object to the form.

19    A.   No.

20    Q.   Before Hurricane Katrina, has Deployed ever

21  submitted any proposals to the State of Florida?

22    A.   Yes.

23    Q.   And what was that?

24    A.   That was an unsolicited proposal for base camps.

25    Q.   Did Chuck Johnson help you with that?

1    A.  No, he did not.

2    Q.  Who was that submitted to?

3    A.  It was submitted to Chuck Hagan.

4    Q.  Was the contract awarded?

5    A.  No.

6    Q.  Prior to Hurricane Katrina, were any proposals

7  ever submitted to the State of North Carolina?

8    A.  No.

9    Q.  Prior to Hurricane Katrina, were any proposals

10  ever submitted to the State of South Carolina?

11    A.  Yes.

12    Q.  And what was that?

13    A.  That was with -- with -- as a subcontractor to

14  PBS&J for base camps.

15    Q.  What is the -- what was the date of that

16  proposal?

17    A.  July of 2005, I believe.

18    Q.  What agency was the proposal solicited to?

19             MR. RUMRELL:  Object to the form.

20    A.  The South Carolina Division of Emergency

21  Management.

22    Q.  Who did you work with at PBS&J on that proposal?

23    A.  Richard Cheek and -- yeah, Richard Cheek.

24    Q.  Was the proposal submitted by PBS&J or was it

25  submitted by Deployed?

14

1    A.  It was submitted by PBS&J.

2    Q.  Was Deployed a subcontractor on the proposal?

3    A.  Yes.

4    Q.  How did you know Mr. Richard Cheek?

5    A.  I met him at a music festival when he came to

6  inspect our work.

7    Q.  What was the name of the music festival?

8    A.  Bonnaroo.

9    Q.  Could you spell that?

10    A.  B-O-N-N-A-R-O-O.

11    Q.  And where was Bonnaroo located?

12    A.  It is in Manchester, Tennessee.

13    Q.  What was Deployed doing at Bonnaroo?

14    A.  We do potable water systems and site support

15  services.

16    Q.  And that's where you met Mr. Richard Cheek?

17    A.  Yes.

18    Q.  What were the circumstances of the meeting?

19    A.  He came down to see what we did.

20    Q.  Was he invited there?

21    A.  I believe he was.

22    Q.  Who invited him?

23    A.  I don't remember.

24    Q.  Could Chuck -- could Chuck Johnson have invited

25  him?

1   A.  He may have.

2   Q.  Okay.  You have no idea how --

3   A.  No.

4   Q.  -- the circumstances surrounding his arrival?

5   A.  I don't recall.

6   Q.  Would Robb Napior know?

7   A.  I don't know.

8   Q.  How long was Mr. Cheek there at Bonnaroo?

9   A.  Two or three days.

10  Q.  And he was with PBS&J at the time?

11  A.  Yes, he was.

12  Q.  And now he works with Deployed Resources; is that

13  correct?

14  A.  Yes, he does.

15  Q.  Okay.  I'm going to show you a copy of an e-mail.

16      MR. RUMRELL:  This one's highlighted.  Is

17  that --

18      MR. NICHOLAS:  That's mine -- that's my

19  highlight.  I'll state that on the record.

20      MR. RUMRELL:  Do you have a copy for me as

21  well?

22      MR. NICHOLAS:  I sure don't, no.

23      MR. RUMRELL:  Okay.  If there's things that

24  you're going to do -- because I was kind enough to

25  provide you copies of everything that we had at the

16

1      time.

2              MR. NICHOLAS:  Uh-huh.

3              MR. RUMRELL:  And that's been the

4      professional way that we've been doing this.

5              MR. NICHOLAS:  And I appreciate that, Rick.

6              MR. RUMRELL:  And I don't want to not do

7      that --

8              MR. NICHOLAS:  We've got two.  I've got

9      another one.

10             MR. RUMRELL:  Okay.  Thank you.

11     BY MR. NICHOLAS:

12     Q.   Read that e-mail for me, sir.

13             MR. RUMRELL:  To yourself.

14             MR. NICHOLAS:  Yes, sir.

15             MR. RUMRELL:  This is not a completed

16     document, by the way.  Do you have the other pages

17     of that?

18             MR. NICHOLAS:  This is my deposition, Rick.

19             MR. RUMRELL:  I don't care.  I'm asking for

20     the completed pages of it.  You asked the witness to

21     read it.  It doesn't -- it's not complete.

22             MR. NICHOLAS:  He can note that on his

23     answer.

24             THE WITNESS:  I've read -- I've read page

25     one of four.

17

1   BY MR. NICHOLAS:

2      Q.  Okay.  You -- you've read page one of four, okay.

3   Does this refresh your memory at all in terms of

4   Bonnaroo?

5      A.  No, it does not.

6            MR. NICHOLAS:  Okay.  Let's mark this as

7      Exhibit 1.

8            MR. RUMRELL:  Are you not going to provide

9      the other three pages?  Is that what you're telling

10     me?

11           MR. NICHOLAS:  It's my deposition right now.

12           MR. RUMRELL:  Just answer the question.  If

13     you're not going to provide them, that's fine.  I

14     just want to know if you're going to provide the

15     other three pages to Exhibit 1.

16           MR. NICHOLAS:  I'm not under oath right now,

17     Rick.

18           MR. RUMRELL:  I'm asking --

19           MR. NICHOLAS:  I'm not answering your

20     questions, Rick.  I'm here to depose the witness.

21           MR. RUMRELL:  Okay.  I'm here for the court,

22     Mr. Nicholas, and the court does not like to have,

23     nor does a jury like to have an incomplete document.

24     It's unfair to the witness and we object to it.

25           MR. NICHOLAS:  Very good.

1          (Exhibit 1, 4/2/05 Series of E-Mails,

2     marked.)

3          (Discussion between Mr. Nicholas and Mr.

4     Levchuk outside the hearing of the reporter.)

5          MR. NICHOLAS:  That's fine.

6   BY MR. NICHOLAS:

7     Q.  I'm going to show you a copy of another document,

8   all right?

9          MR. RUMRELL:  This one, too, is highlighted?

10         MR. NICHOLAS:  Yes, sir.

11         MR. RUMRELL:  I guess by you?

12         MR. NICHOLAS:  Yes, sir.

13         MR. RUMRELL:  Okay.

14   BY MR. NICHOLAS:

15     Q.  Let me hand you this document.

16     A.  Okay.  I've read the document.

17     Q.  Okay.  I particularly call your attention to the

18   middle stream of e-mail.  It's from Richard Stapleton

19   sent Wednesday, April the 27th, 10:38, to Chuck Johnson.

20          Do you see that e-mail?

21     A.  Yes.

22     Q.  Okay.  And it states, "So, this is what the big

23   guys are doing."

24          Do you see that statement?

25     A.  Yes.

19

1    Q.  "Are we going to meet with PBS&J in the future?"

2       Do you see that statement?

3    A.  Yes.

4    Q.  So, it seems like you're asking Chuck Johnson to

5  arrange some meeting with PBS&J; isn't that correct?

6    A.  That could be correct.

7          MR. NICHOLAS:  Okay.  We'll mark this

8    Exhibit 2.

9          (Exhibit 2, 4/27/05 Series of E-Mails,

10    marked.)

11  BY MR. NICHOLAS:

12    Q.  Who did you know at PBS&J at the time of this

13  e-mail on April the 27th, 2005?

14    A.  I didn't know anybody.

15    Q.  Did you know Richard Cheek?

16    A.  I don't know.

17    Q.  Okay.  Did you know Eric Tolbert?

18    A.  No.

19    Q.  Okay.  I'm going to show you another document.

20          (Exhibit 3, 5/9/05 Series of E-Mails,

21    marked.)

22          MR. RUMRELL:  Just so I'm noting it -- it

23    appears to be two separate documents.  The first one

24    says "pages one of two," and then there are no Bates

25    stamps on the other three pages.

20

1          So, are you representing this as one

2     document?

3          MR. NICHOLAS:  No, I'm asking him to look at

4     the document I gave him.

5  BY MR. NICHOLAS:

6     Q.  Please take your time, sir, read it.

7     A.  Okay.

8     Q.  Do you recognize this document, sir, any of the

9  e-mail strings?

10          MR. RUMRELL:  Object to the form.

11     A.  I -- I do recall some of this happening, yes.

12     Q.  What was happening here?

13     A.  That we were sent -- PBS&J was developing a

14  marketing plan for utility companies, and Chuck Johnson

15  sent this to us to work on a price for items we would

16  have provided for this proposal, and the bulk of the

17  e-mail is involving our concern with having a

18  nondisclosure agreement to protect our proprietary

19  information.

20     Q.  Okay.  When was Bonnaroo, do you recall?

21          MR. RUMRELL:  Which year?

22     Q.  The year at issue in 2005.  Do you remember the

23  month Bonnaroo was in 2005?

24     A.  June.

25     Q.  So, was Chuck Johnson helping you procure work

1    from PBS&J at this time?

2        A.  He was trying to.

3        Q.  Okay.  How was he trying to?

4        A.  By asking us to quote this customer.

5        Q.  Okay.  If he would have procured the work for

6    you, would he have been entitled to payment?

7                MR. RUMRELL:  Object to the form.

8        A.  If we would have agreed to that for this

9    particular project, yes.

10       Q.  Okay.  Agreed to what, sir?

11       A.  That he was procuring that contract for us, and

12   we would at that point discuss what fee he would get.

13       Q.  Who would he have -- else would he have been

14   procuring this work for if not you?

15                MR. RUMRELL:  Object to the form.

16       A.  I have no idea.

17       Q.  But do you agree that prior to Bonnaroo in June

18   of 2005, you never met Richard Cheek; is that correct?

19       A.  Not that I recall.

20                MR. NICHOLAS:  Okay.  We'll mark this as the

21          next numbered exhibit.

22                THE REPORTER:  We'll mark it as 3.

23                MR. NICHOLAS:  Yes, ma'am.

24                (Exhibit 3, 5/9/05 Series of E-mails,

25          marked.)

22

1   BY MR. NICHOLAS:

2       Q.   I'm going to show you a copy of another e-mail.

3       A.   Okay.

4       Q.   Do you recognize that e-mail?

5       A.   Now that I've read it, yes.

6       Q.   What was the circumstances of that e-mail?

7       A.   Richard Cheek was thanking us for the site visit

8   at the Bonnaroo site in 2005 of June.

9       Q.   And it's your testimony you have no idea as to

10   who invited Richard Cheek to the site?

11      A.   I don't know who invited him.

12      Q.   Okay.  You do agree that you did not know anyone

13   at PBS&J prior to Bonnaroo, correct?

14      A.   Not that I recall.

15      Q.   Did anyone in Deployed Resources -- any of the

16   employees -- staff know anyone at PBS&J prior to

17   Bonnaroo?

18      A.   I don't know.

19           MR. NICHOLAS:  Let's go ahead and mark this

20      one as the next exhibit, please.

21           (Exhibit 4, 6/9/05 Series of E-Mails,

22      marked.)

23   BY MR. NICHOLAS:

24      Q.   I'll hand this to you, sir.

25           THE VIDEOGRAPHER:  I'm sorry.  Your water

1          got in the shot again.  Thank you.

2     A.  Okay.

3     Q.  Thank you for looking at the document,

4  Mr. Stapleton.  What is this document?

5     A.  This was the proposal from Deployed Resources,

6  technical and cost proposal to PBS&J for that -- for the

7  South Carolina standby technical assistance temporary

8  facilities base camps and logistic staging areas and

9  related equipment RFD they -- they were responding to.

10    Q.  Okay.  Do you see -- what was the date of this

11  proposal?

12    A.  July 27th, 2005.

13    Q.  And that was prior to Hurricane Katrina?

14    A.  Yes, it was.

15    Q.  Do you recall working with PBS&J on the proposal?

16    A.  Yes, I do.

17    Q.  Who did you work with at PBS&J?

18    A.  Dick Cheek and Eric Tolbert.

19    Q.  So, this proposal was after Bonnaroo; is that

20  correct?

21    A.  Yes.

22    Q.  Who was at Bonnaroo in terms of the meeting?  Was

23  it -- let me strike that.

24        Was Rich Cheek the only PBS&J guy there?

25    A.  Yes.

1    Q.   Okay.  And were you there?

2    A.   For one day.

3    Q.   Okay.  Was Robb Napior there?

4    A.   Yes.

5    Q.   Okay.  Was any other Deployed person there?

6    A.   Yes.

7    Q.   Who else was there, that would have interfaced

8    with Richard Cheek?

9    A.   Ray Hamlin.

10   Q.   Okay.

11   A.   And I would have to look at our records to see

12   who the other staff were on site.

13   Q.   Was Chuck Johnson there?

14   A.   Yes, he was.

15   Q.   Why was he there?

16   A.   He came to see the equip -- their operation, as

17   did Dick Cheek.

18   Q.   And you don't recall if Chuck Johnson brought

19   Richard Cheek with him?

20   A.   I don't know.

21   Q.   Let me show you a copy of this e-mail again.

22   It's Exhibit Number 1.  All right?

23   A.   Uh-huh.

24   Q.   I want you to read the highlighted section of it

25   for me.

1    A.  Okay.

2    Q.  Not out -- just to yourself, sir.

3    A.  Okay.

4    Q.  The highlighted section states, "Spoke with Chuck

5  about this and meeting with PBS&J people."

6        Do you see that sentence?

7    A.  Yes.

8    Q.  Is "Chuck" referring to "Chuck Johnson?"

9    A.  Yes.

10   Q.  Okay.  And then the next sentence, "That one

11  could lead to us FEMA national and utilities as well."

12       Do you see that one?

13   A.  Yes.

14   Q.  So, isn't it fair to say that Chuck was arranging

15  some meeting with PBS&J people for you?

16            MR. RUMRELL:  Object to the form.

17   A.  Can you repeat the question, sir?

18   Q.  Reading the e-mail, isn't it fair to say that

19  Chuck was arranging some meeting with PBS&J people for

20  Deployed?

21            MR. RUMRELL:  Object to the form.

22   A.  Yes.

23   Q.  Okay.  Did the meeting occur?

24   A.  I don't know what you're asking me.  What

25  meeting?

1    Q.  The meeting that's referenced in this e-mail.

2    A.  I'm not sure I understand what you're asking me,

3  Mr. Nicholas.

4    Q.  Did Chuck Johnson ever arrange a meeting with

5  PBS&J?

6    A.  Yes.

7    Q.  Okay.  And the reason he arranged the meeting was

8  for Deployed, correct?

9    A.  I don't know.

10   Q.  Okay.  Is there anyone at your company that would

11  know the reasons a meeting with PBS&J was arranged?

12   A.  Well, to provide -- to try and do work with them.

13   Q.  So, is it your testimony that the relationship

14  with PBS&J would have been valuable?

15           MR. RUMRELL:  Object to the form.

16   A.  I don't know if it would be valuable or not.

17   Q.  Could PBS&J help Deployed get business?

18   A.  Yes, they could.

19   Q.  Okay.  So, it would benefit Deployed Resources

20  knowing PBS&J, correct?

21   A.  It could.

22   Q.  Did it?

23   A.  No.

24   Q.  No benefit at all?

25   A.  No.

1          MR. NICHOLAS:  Okay.  Let's go ahead and

2     mark this as the next exhibit here.

3          (Exhibit 5, Technical Cost Proposal,

4     marked.)

5          MR. NICHOLAS:  Is it marked?

6          THE REPORTER:  Yes, it is.

7          MR. NICHOLAS:  Okay.

8     BY MR. NICHOLAS:

9     Q.  Mr. Stapleton, Exhibit Number 5, is this -- I

10    term it the "National Rural Education-Type of Proposal."

11    Is that what this is?

12    A.  No, it is not.

13    Q.  When did the National Rural Education Proposal

14    get made?

15          MR. RUMRELL:  Object to the name.  It's not

16     a correct name.

17    A.  It's the -- the National Rural Electrical

18    Cooperative Association contract.

19    Q.  Yes, sir.

20    A.  And that contract, I don't recall if that was

21    2005 or 2006 that proposal was submitted.

22    Q.  Was it submitted with PBS&J?

23    A.  Yes, they were the prime contractor.

24    Q.  Okay.  And this proposal you've identified, or

25    we've marked as Exhibit 5, this was submitted with PBS&J

1  as well, correct?

2      A.  Yes, for a totally separate contract that was not

3  awarded.

4      Q.  Okay.  But PBS&J, you were working with PBS&J at

5  the time of Exhibit 5; isn't that correct?

6      A.  No, we -- we submitted a proposal to them for a

7  public project that was not awarded.  So, we had not

8  done any work with them.

9      Q.  Okay.  I'm going to hand you a copy of Exhibit 4

10  again.  All right?

11      A.  Uh-huh.

12      Q.  And please refresh your memory with it.

13      A.  Okay.

14      Q.  I've identified it -- I'll refer to it as a

15  "thank you letter," but you see -- you've read the

16  exhibit, correct?

17      A.  Yes, I have.

18      Q.  At the bottom of the e-mail, Mr. Cheek appears to

19  be inviting you to come by the Mobile Convention Center.

20         What was he referring to?

21         MR. RUMRELL:  It's actually Mobile.

22      A.  The Mobile Convention Center would be the

23  disaster -- or the hurricane conference for the State of

24  Alabama.

25      Q.  Okay.  Would those have been the dates of the

1    conference, June the 21st?

2        A.  I would imagine.  I don't know for a fact.

3        Q.  What would the worker pods refer to?

4        A.  I have no idea.

5        Q.  Could it be the cogen units?

6        A.  I don't know.

7        Q.  Okay.  Did you attend this conference?

8        A.  No, I did not.

9        Q.  Did anyone from Deployed attend the conference?

10       A.  Yes.

11       Q.  And who was that?

12       A.  That was Mr. Ray Hamlin.

13       Q.  Okay.  And Ray had met Richard Cheek at Bonnaroo?

14       A.  Yes.

15       Q.  Between Bonnaroo and Hurricane Katrina, how many

16   meetings did you have with PBS&J?

17       A.  One.

18       Q.  Who was at the meeting?

19       A.  Richard Stapleton, Robert Napior, Eric Tolbert,

20   and Richard Cheek.

21       Q.  Where was the meeting at?

22       A.  Charlotte, I believe.

23       Q.  What was the purpose of the meeting?

24       A.  To discuss this proposal.

25       Q.  And by "this proposal," you're referring to

1   Exhibit 5, technical --

2       A.  The technical -- the standby, technical

3   assistance contract for South Carolina Emergency

4   Management Department.

5       Q.  Was any other business discussed?

6       A.  Just doing work for PBS&J, if they had a need.

7       Q.  What type of work did they discuss with you as

8   potential areas of need?

9       A.  They didn't disclose.  They said they had a

10  number of clients.

11      Q.  Okay.  Do you recall when that meeting would have

12  been?

13      A.  Pre -- early January or early July 2005.  It was

14  before this proposal.

15      Q.  No other meeting with PBS&J?

16              MR. RUMRELL:  Object to the form.

17      A.  None that I recall.

18      Q.  Other than Bonnaroo?

19      A.  None that I recall.

20      Q.  Okay.  I'm showing you a copy of another

21  document.

22              MR. NICHOLAS:  We can mark this one.  You

23      can mark this one for me.

24              (Exhibit 6, Meeting Agenda, marked.)

25              THE WITNESS:  Okay.

1    BY MR. NICHOLAS:

2        Q.  Do you recognize this document, sir?

3        A.  Yes.

4        Q.  It seems to be indicating at the top there was a

5    meeting on 11 August '05.

6            Do you see that?

7        A.  Yes.

8        Q.  Did that meeting occur?

9        A.  Yes, it did.  That's -- that's the meeting -- it

10    must have happened after this proposal.

11        Q.  Okay.  So, this meeting had a particular agenda;

12    is that correct?

13        A.  I believe so.

14        Q.  Okay.  Was this agenda provided to you prior to

15    the meeting?

16        A.  I don't recall.

17        Q.  Okay.  Did you discuss potential projects with

18    PBS&J, as indicated on the agenda?

19        A.  Yes.

20        Q.  Okay.  Did you discuss FEMA access?

21        A.  I don't remember.

22        Q.  Okay.  Did you discuss states SC, AL, NC, FL,

23    others?

24        A.  I don't remember.

25        Q.  Okay.  Did you discuss potential projects in

1   large municipalities?

2      A.  I don't remember.

3      Q.  Okay.  Did you discuss commercial client,

4   continuity assistance for physical plant and infra-

5   structure?

6      A.  No, we did not discuss continuity assistance for

7   plant and infrastructure.

8      Q.  You distinctly remember that?

9      A.  Oh, wait a minute.  We did discuss opportunities

10  and potential projects.  I don't remember the specific

11  items.

12     Q.  Okay.  That's fair enough.  Where it says

13  "Discuss teaming arrangements" at the top of the

14  document --

15     A.  Okay.

16     Q.  What teaming arrangements?

17     A.  Nothing ever transpired.

18     Q.  Okay.  It refers to "blanket subcontract/teaming

19  agreement."

20         What would that refer to?

21     A.  That would refer to an open-ended teaming

22  agreement for us to work with a client.

23     Q.  Okay.  And that would -- and the client would

24  have been PBS&J?

25     A.  Yes.  If -- relating to this, yes.

1    Q.  Okay.  It refers to "Individual subcontractors on

2  a project by project basis."

3        Did you discuss that?

4    A.  Yes.  That -- that is in lieu of the first one.

5    Q.  Okay.  Did you discuss "NDAs for processes and

6  procedures?"

7    A.  Yes, we did.

8    Q.  What does that refer to, "NDA?"

9    A.  Nondisclosure agreement.

10    Q.  Okay.  And we discussed those nondisclosure

11  agreements in the e-mails.  Do you recall the reference

12  to nondisclosure agreements?

13    A.  Yes.

14    Q.  Okay.  And the next one says, "What is needed

15  from Deployed to be an approved PBS&J vendor."

16        Did you discuss that?

17    A.  Yes.

18    Q.  Who were the references you provided to PBS&J?

19    A.  We didn't provide references.

20    Q.  Not one reference was provided?

21    A.  Just the past performance examples submitted in

22  Exhibit 5.

23    Q.  Do you know if PBS&J talked to Chuck Johnson

24  about you?

25    A.  No, I do not.

1    Q.  Okay.  In looking at the past performance

2  references in Exhibit Number 5 --

3    A.  Okay.

4    Q.  -- I don't see any emergency disaster work there;

5  is that correct?

6    A.  No, it is not.  There is mobile showers from

7  Hurricanes Charlie, Francis, Ivan, and Jeanne.

8    Q.  Okay.

9    A.  Mobile showers for Hurricane Dennis and the crime

10  scene support camp, fresh kills landfill.

11    Q.  And that was the work that was obtained from

12  Chuck Johnson?

13    A.  Yes.

14    Q.  Is there any emergency work on that list that you

15  obtained yourself?

16    A.  No.

17    Q.  You don't recall ever providing any references to

18  PBS&J at all?

19            MR. RUMRELL:  Object to the form.

20    A.  No, I do not.

21    Q.  Okay.  Thank you.  Do you recall discussing your

22  qualifications with PBS&J?

23    A.  Yes, I do.

24    Q.  Okay.  Did you discuss any payment arrangements

25  with PBS&J?

1    A.  Yes, we did.

2    Q.  And what were those arrangements?

3    A.  That if they -- we gave them -- we had a
4   published price list that we would offer them a five
5   percent credit if they used those numbers to their
6   customers.

7    Q.  Okay.  Was Deployed ever an approved PBS&J
8   vendor?

9    A.  No.

10   Q.  Were you still submitting proposals with --
11  through PBS&J, even though you weren't an approved
12  vendor?

13   A.  We never won a contract with them to become an
14  approved vendor.

15   Q.  Okay.

16   A.  Until the IATAC contract.

17   Q.  Uh-huh.

18   A.  But we were a subcontractor to them on that
19  contract.

20   Q.  What contract was that?  Spell it out for the
21  record for me, the IATAC contract.

22   A.  I-A-T-A-C.

23   Q.  Okay.  And what does the acronym stand for?

24  International --

25   A.  Individual Assistance Technical Assistance

1    Contract.

2        Q.  Okay.  And these meetings with PBS&J, they were

3    prior to Hurricane Katrina, correct?

4        A.  Yes.  The meeting in August?

5        Q.  Okay.  And, again, you think the meeting in

6    August was actually the background, so to speak, for

7    Exhibit 5; is that your testimony?

8        A.  What is Exhibit 5?

9        Q.  Exhibit 5 was the technical assistance

10   contract -- technical and cost proposal.

11       A.  What was your question?

12       Q.  Yes.  Is this meeting that's referenced on August

13   the 11th, 2005 the meeting that produced the technical

14   and cost proposal in Exhibit 5?

15       A.  No, because this proposal was July 27th and this

16   meeting was two weeks later.

17       Q.  Okay.  Could there have been another meeting at

18   around the time of July 27th?

19       A.  I don't recall.

20       Q.  Okay.  But would anyone at Deployed have a better

21   recollection than you?  Perhaps Robb Napior?

22       A.  No.

23       Q.  Okay.  Was Robb Napior at this meeting on

24   August 11th, 2005?

25       A.  Yes.

1    Q.  What are his duties with the company?

2    A.  He's in charge of operations, project management.

3    Q.  Okay.

4    A.  Meeting --

5    Q.  Okay.  Was Chuck Johnson at this meeting?

6    A.  No, he was not.

7    Q.  Okay.  Was this meeting the first time you had

8  met Eric Tolbert?

9    A.  Yes.

10    Q.  Okay.  Do you recall any specific discussions

11  with Eric Tolbert?

12    A.  Just answering questions as far as what we do

13  base camp-wise temporary facilities, how we perform

14  business, how we -- all the assets we own we retain, the

15  staff we retain, the ability we have to execute how we

16  work within military markets.  We have an excellent

17  track record in the military that would -- he felt that

18  would carry over into, if a need would -- for disaster

19  response.

20    Q.  Uh-huh.

21    A.  That was about it.  I mean, what type of

22  insurance they would require from us to do the work,

23  insurances are considerable.  You know, he -- that was

24  pretty much it.  What we could do, what we owned, who we

25  were, make sure we weren't a storefront, we were

1    actually a legitimate business.

2        Q.  Did they ever visit your site, anyone at PBS&J?

3        A.  Which site?

4        Q.  Let's go over all the sites.  I think you have a

5    site in Rome, correct, sir?

6        A.  Correct.

7        Q.  Did he ever -- anyone from PBS&J ever go to your

8    site there?

9        A.  Yes.

10       Q.  Who was that?

11       A.  Steve Glenn and -- I don't recall the gentleman's

12   name.  He was -- Ed Mayfield.

13       Q.  Okay.  Was that before or after Katrina?

14       A.  It was after.

15       Q.  Okay.  Did anyone at PBS&J visit your site before

16   Katrina?

17               MR. RUMRELL:  At Rome?

18       A.  Not in Rome.

19       Q.  Okay.  Did anyone at PBS&J visit any of the sites

20   before Katrina?

21       A.  Yes.

22       Q.  And what sites were those?

23       A.  That would have been Bonnaroo.

24       Q.  Okay.  Any other ones?

25       A.  Not that I recall.

1     Q.   Okay.   Did PBS&J discuss base camps with

2   Deployed?

3     A.   Yes.

4     Q.   What was the circumstances of that discussion?

5     A.   Could you clarify who?   At PBS&J --

6     Q.   Yes, let's go back.   Yes, sir.   Who discussed

7   base camps with you from PBS&J?

8     A.   Richard Cheek and Eric Tolbert.

9     Q.   And what was the subject of that discussion?

10    A.   Being able to provide temporary facilities for

11   states that may need them.

12    Q.   Okay.   And that was the meeting in North

13   Carolina; is that correct, sir?

14    A.   Yes.   And prior phone calls and/or e-mails

15   related to the South Carolina contract.

16    Q.   Okay.   Do you have -- does Deployed have e-mails

17   in its possession regarding the South Carolina contract?

18    A.   All that information has been forwarded under

19   discovery.

20    Q.   Okay.   That's a fair answer.   Do you think there

21   are e-mails regarding that contract?

22    A.   I would have to look in the file, Mr. Nicholas.

23    Q.   Okay.   Did you have many exchanges with PBS&J via

24   e-mail between Bonnaroo and Hurricane Katrina?

25    A.   There were a couple regarding this contract.

1    Q.  Okay.  And is it your testimony that you've given

2  those documents to your attorney?

3    A.  Yes, it is.

4    Q.  Okay.  Do you recall the approximate dates of

5  those e-mail communications, just approximately?

6    A.  June, July of '05, prior to this bid.

7    Q.  Okay.  Would Chuck Johnson have been copied on

8  those e-mails?

9    A.  I have no idea.

10    Q.  Was it your custom or practice to copy Chuck

11  Johnson on e-mails?

12        MR. RUMRELL:  Object to the form.

13    A.  If he was involved with the project, yes.

14    Q.  Okay.  Was he involved in this PBS&J project?

15    A.  No.

16    Q.  Even though he introduced PBS&J to Deployed?

17    A.  Had no bearing.

18    Q.  Why is that?

19    A.  He didn't specifically state this was a project

20  he was -- he was providing to us.

21    Q.  Okay.  And is it your testimony he has to state

22  that to be involved in a project?

23    A.  Yes.  How else -- he would -- he would provide us

24  a specific contract or ask for -- or provide -- provide

25  a lead that he was working to procure for us.

1      Q.   Okay.

2      A.   There was never an open-ended anything in the

3  disaster world as Chuck Johnson's work.

4      Q.   Okay.  Was PBS&J a lead he provided to you?

5           MR. RUMRELL:  Object to the form.

6      A.   The -- for that e-mail for the National

7  Electrical Utility Company, yes.

8      Q.   Okay.  He did have the relationship with PBS&J

9  and Deployed did not; isn't that correct?

10     A.   I don't know.

11          MR. RUMRELL:  Object to form.

12     Q.   Okay.  But it was your testimony that you did not

13  know anyone at PBS&J prior to Bonnaroo, correct?

14     A.   Correct.

15     Q.   Okay.  Mr. Stapleton, if base camps would have

16  resulted in connection with any of the work with PBS&J,

17  would Mr. Johnson have been entitled to any payment?

18          MR. RUMRELL:  Object to the form.

19     A.   Can you be more specific --

20     Q.   Yes, sir.

21     A.   -- with the question?

22     Q.   If base camps had resulted in connection with

23  Deployed's work with PBS&J, would Chuck Johnson,

24  Unlimited Resources, be entitled to any type of payment

25  from that work?

1          MR. RUMRELL:  Object to the form.

2     A.  If he forwarded that particular project, we would

3  discuss a payment at that particular project.

4     Q.  So, you don't believe he forwarded you any PBS&J

5  projects?

6          MR. RUMRELL:  Object to the form.

7     A.  We've never done any PBS&J projects he was

8  involved with.  They were never awarded.

9     Q.  Okay.

10    A.  So, I can't answer your question.

11    Q.  Okay.  Before Hurricane Katrina, describe for me

12 all agreements you had with Chuck Johnson.

13         MR. RUMRELL:  Object to the form.

14    A.  We didn't have an agreement with Chuck Johnson.

15    Q.  Okay.  No agreement at all?

16         MR. RUMRELL:  Object to the form.

17    A.  No, project by project, we would evaluate each

18 one and we would agree -- if he found -- if he sent us a

19 project that proved valid, where we actually did work,

20 we would agree on a payment at that project.

21    Q.  Okay.  Let's go over some of the projects he sent

22 you.

23    A.  Okay.

24    Q.  Okay.  We talked about the Comfort Zone, the

25 showers.

1     A.   Yes.

2     Q.   He sent you that project?

3     A.   Yes.

4     Q.   And what was the payment arrangement for that

5  project?

6     A.   The payment arrangement for that project was 10

7  percent of the shower rental assets only.

8     Q.   Okay.   And was that a written agreement?   Was it

9  an oral agreement?

10              MR. RUMRELL:   Object to the form.

11     A.   That was an oral agreement.   It was the same

12  manner that Comfort Zone did his agreement.

13     Q.   Okay.   So, it was 10 percent of the shower rental

14  only; is that correct?

15     A.   Yes.

16     Q.   Okay.   And for Garner -- you identified Garner --

17  what was the payment mechanism there?

18     A.   That was we split the profit.

19     Q.   Okay.   Was that also via some type of an oral

20  agreement?

21     A.   Yes, it was an oral discussion.

22     Q.   Okay.   The agreement regarding the Comfort Zone

23  shower rentals, how did you negotiate that agreement?

24  Was it on the phone?   Was it in person?

25     A.   On the phone.

44

1    Q.   Okay.  Do you recall Mr. Johnson ever sending you

2  any written agreements after the phone conversations?

3              MR. RUMRELL:  Object to the form.

4    A.   He sent me some agreements.

5    Q.   Okay.

6    A.   We never agreed to them.

7    Q.   Did you -- did you ever tell him that the written

8  agreement was not agreeable?

9    A.   Yes.

10   Q.   You did?

11   A.   Numerous times.

12   Q.   How did you tell him?  Did you do it writing?

13             MR. RUMRELL:  Object to the form.

14   A.   Yes, I did.

15   Q.   Okay.  Have you produced those writings in

16  connection with this case?

17   A.   Yes, we did.

18   Q.   Okay.  Would you have been the author of those

19  writings or would it be somebody else?

20   A.   Myself and our corporate attorney.

21   Q.   Okay.  And your corporate attorney, his last name

22  is Rick --

23   A.   Rea.

24   Q.   Rea?

25   A.   Yes.

1    Q.  Okay.  How many total agreements did Chuck

2  Johnson send you and ask you to sign?

3    A.  Three, I believe.

4    Q.  Okay.  Did you object to every one of those

5  agreements?

6    A.  Yes, we did.

7    Q.  And each one would have some type of an in-

8  writing objection?

9              MR. RUMRELL:  Object to the form.

10   A.  No.

11   Q.  Okay.

12   A.  We refused to sign the agreements.

13   Q.  Okay.  Did you ever tell Mr. Johnson that you

14  were refusing to sign the agreements?

15   A.  Yes.

16   Q.  Okay.  Did anyone hear you tell him that?

17             MR. RUMRELL:  Object to the form.

18   A.  No one was with me.  I don't know who was with

19  him.

20   Q.  Okay.  When was the first time you told him that

21  Deployed refused to sign the agreements?

22   A.  After 9/11.

23   Q.  Okay.  And that would have been in connection

24  with Garner?

25   A.  Yes.

1    Q.   What were you doing with Garner?

2    A.   We were providing mobile office trailers,

3  temporary power distribution generators, potable water

4  tankers.

5    Q.   And that would have been the first time you would

6  have received a proposed written agreement?

7    A.   I'm not sure -- what are you asking?

8    Q.   When was the earliest agreement Chuck Johnson

9  ever mailed to you?

10   A.   It was in October or November of 2001.

11   Q.   Okay.

12   A.   And I believe he faxed it.

13   Q.   Okay.  And you communicated to him that the

14  agreement that he mailed you or faxed you was not

15  acceptable?

16   A.   Yes, we did.

17        MR. RUMRELL:  Object to the form.

18   Q.   Okay.  And if it was in writing, you would have

19  produced that writing in this case; is that correct?

20        MR. RUMRELL:  Object to the form.

21   A.   We did produce that alternate agreement in

22  writing --

23   Q.   Okay.

24   A.   -- under discuss -- through discovery.

25   Q.   Okay.  The only alternate agreement I -- I've

1    seen has a different percentage rate.

2            MR. RUMRELL:  Object to the form.

3    Q.  Do you recall the percentage rate of compensation

4    in the alternate agreement?

5    A.  There was no guaranteed rate.  It was a

6    project-by-project basis to be discussed at the time of

7    each contract --

8    Q.  Okay.

9    A.  -- for each -- each procurement.

10   Q.  Okay.

11           MR. NICHOLAS:  John, do you have a copy of

12      this?

13           MR. LEVCHUK:  Yes, it's number four.

14           MR. NICHOLAS:  Thank you.  Would you mark

15      this for me?

16           MR. RUMRELL:  Is it Exhibit 6?

17           THE REPORTER:  Seven.

18           MR. RUMRELL:  Seven?

19           THE REPORTER:  Yes.

20           (Exhibit 7, Vendor Ledgers, marked.)

21   BY MR. NICHOLAS:

22   Q.  Please read it to yourself, Mr. Stapleton, get

23   familiar with it.

24   A.  Okay.

25   Q.  First question I have for you, Mr. Stapleton, is

1    that your handwriting?

2    A.   Yes, it is.

3    Q.   And is all of this your handwriting?

4    A.   Yes.

5    Q.   Now, do you know what this document is?  Could

6    you describe what the printed portion of it is?

7    A.   It's a ledger report for payments made to

8    Unlimited Resources.

9    Q.   Would this be for Comfort Zone?

10    A.   It would be for Comfort Zone, for Florida DEM,

11    Florida DEH.

12    Q.   And for the record, spell that out for me.

13    Florida DEM, what is that?

14    A.   Florida DEM is the Florida Division of Emergency

15    Management.  Florida DOH is the Florida Department of

16    Health.

17    Q.   Okay.  Can you identify, looking at this

18    particular document, what entries are Comfort Zone

19    dot -- Comfort Zone entries?

20    A.   From the printed portion or my handwriting?

21    Q.   From either, sir.

22    A.   It shows -- I don't know what the payments -- I

23    would have to look at my spreadsheet --

24    Q.   Okay.

25    A.   -- from -- that we submitted in our October 3rd

1    response to Mr. Johnson's request for --

2        Q.  Okay.

3        A.  -- compensation.

4        Q.  Okay.  Let me show you another document here.

5            (Exhibit 8, 8/30/06 Letter from Unlimited

6    Resources via E-Mail, marked.)

7    BY MR. NICHOLAS:

8        Q.  Please take your time, sir, and look at it.

9        A.  Okay.

10       Q.  Mr. Stapleton, do you recall getting the letter

11   that's attached as Exhibit 8?

12       A.  Yes, I do.

13       Q.  Okay.  Exhibit 7, which is under that document,

14   is this the -- I guess -- right there, sir.

15       A.  Uh-huh.

16       Q.  It's not marked in your copy, but that's

17   Exhibit 7.  Is this the reconciliation you provided to

18   Mr. Johnson in response to that letter?

19                   MR. RUMRELL:  Object to the form.

20       A.  No, it is not.

21       Q.  It's not?  Okay.  Let me ask you this question:

22   Looking at Exhibit 7 --

23       A.  Okay.

24       Q.  -- okay, it says on it "discretionary amount."

25   Do you see that circled?

50

1    A.   Uh-huh.

2    Q.   And it says, "Paid to URI."   Is that Unlimited

3    Resources, Inc.?

4    A.   Yes.

5    Q.   140,000.

6    A.   Uh-huh.

7    Q.   And I don't know what that line means.   There's

8    like a -- what is that line, sir?   Any idea?   Is that

9    up?  Or --

10    A.   (Shakes head.)   Just an arrow.

11    Q.   An arrow.   It's an arrow, okay.

12         4.9 percent, do you see that?

13    A.   Correct.

14    Q.   Okay.  And at the bottom, it says, "discretionary

15    amount."

16    A.   Correct.

17    Q.   Okay.  URI, Unlimited Resources, 225,000 --

18    A.   Correct.

19    Q.   -- at 6.4 percent.  Do you see that?

20    A.   Yes.

21    Q.   What was the calculation methodology you were

22    using to arrive at those numbers?

23    A.   I'm not sure.

24    Q.   Okay.  Is there anything that you could -- that

25    you could look at that would help you remember the

1   calculation methodology?

2      A.  Do you have my October 3rd response?

3      Q.  I will try to find that for you and we'll go over

4   it maybe after lunch.

5          Would that help you explain it?

6      A.  It might.

7      Q.  Okay.  But as of right now, you're not sure what

8   this means, "discretionary amount?"

9              MR. RUMRELL:  Object to the form.

10     A.  No, I don't.

11     Q.  Okay.  In terms of your bookkeeping, do you

12  frequently use the term "discretionary amount?"

13     A.  No, we do not.  That was a term that I was --

14  that was discussed with my counsel, with corporate

15  counsel, as we prepared our response for the letter.

16     Q.  Okay.  I don't want you to tell me any

17  discussions with your counsel.  I appreciate that,

18  but -- okay.

19          And then it says "Clearbrook," I think that's

20  "Dan Beck, dash, Bruce Wagner."

21     A.  Uh-huh.

22     Q.  Is there a particular reason that is on this

23  document?

24     A.  No.

25     Q.  Okay.  And it breaks down for 2005 -- there's a

1    column that says, "FL DOH 41,000."

2    A.  Yes.

3    Q.  "CZ," is that showers?

4    A.  Yes.

5    Q.  "CZ showers."

6    A.  Yes.

7    Q.  FL -- and then there's a total under that.  What

8    is that number?  Can you read that?

9    A.  Looks like $3,503,465.

10   Q.  Is that -- I'm sorry, sir.  Is that somehow

11   connected with Clearbrook?

12   A.  No, it is not.

13   Q.  Okay.  Then why is Clearbrook's name in the

14   margin in here next to it; do you know?

15   A.  No, I do not.

16   Q.  Okay.  And the top of the document -- top more so

17   the middle of the document, there's a -- there's a --

18   looks like a box.

19   A.  Yes.

20   Q.  I'll point it to you.  It says, "List of projects

21   we acknowledged he sourced."

22        Do you see that -- do you see that statement?

23   A.  Yes.

24   Q.  Is that what it says?  "List of projects we

25   acknowledge he sourced?"

1    A.  Yes.

2    Q.  Would "he" be Chuck Johnson?

3    A.  Yes.

4    Q.  Okay.  And then it says '04, '05.

5    A.  Correct.

6    Q.  Okay.  And then it says "Clearbrook" underneath

7  that?  Do you see that?

8    A.  I see that.

9    Q.  Okay.  Is there any reason the name "Clearbrook"

10  is under "List of projects he sourced?"

11        MR. RUMRELL:  Object to the form.

12    A.  It has no -- this -- this was notes from my

13  discussion with Jeff Rea.

14        MR. RUMRELL:  I don't want you to go into

15     the details of that.

16  BY MR. NICHOLAS:

17    Q.  Okay.  What was your understanding of the payment

18  structure for the Comfort Zone showers?

19    A.  Our agreement was we paid 10 percent of the

20  shower rental revenue only, not the entire contract.

21    Q.  Okay.  Shower rental revenue only is --

22    A.  Correct.

23    Q.  How does that reconcile with 4.9 percent here?

24    A.  I have no idea.

25    Q.  And 6.4 percent there?

1     A.  I don't know.

2     Q.  Okay.  This was marked.  Okay.  Good.

3        Okay.  Was this payment of $365,000 at the bottom

4   of the printed column --

5     A.  Okay.

6     Q.  -- was that made to Chuck Johnson before, I call

7   this a reconciliation, before the hand-writings here?

8            MR. RUMRELL:  Object to the form.  You're

9       asking date-wise?

10           MR. NICHOLAS:  Yeah.

11           MR. RUMRELL:  Can you rephrase the question

12      then, because I don't think that's clear.

13  BY MR. NICHOLAS:

14    Q.  $365,000, do you see that sum?

15    A.  Yes.

16    Q.  Was this sum paid before these calculations from

17  the bottom were made?

18           MR. RUMRELL:  The handwritten notes.

19    A.  Yes.

20    Q.  Okay.

21    A.  Shows right there when the dates of payment were.

22    Q.  Okay.  So, these calculations were after the

23  payments of 365,000?

24           MR. RUMRELL:  Object to the form.

25    A.  These aren't calculations.

1    Q.  Okay.  Then what are they?

2    A.  This is how much each contract total value was

3  worth.

4    Q.  Okay.  So, when it says -- just so I understand

5  it, "Paid, 225-, 6.4 percent," what is that referring

6  to?

7         MR. RUMRELL:  He's already answered that

8     question.

9    Q.  You can answer, if you can.

10         MR. RUMRELL:  Object to the form.

11    A.  That 225,000 is what was paid in 2005.

12    Q.  Okay.  And this one up here, "Paid to URI 140-,

13  4.9 percent, can you explain that one to me?

14         MR. RUMRELL:  Object to the form.

15    A.  That was the amount of money paid in 2004 --

16    Q.  Okay.

17    A.  -- for the Comfort Zone projects.

18    Q.  Okay.  And the Comfort Zone relationship was just

19  an oral understanding between the parties?

20         MR. RUMRELL:  Object to the form.

21    A.  Yes, it was.

22    Q.  Okay.  Look at the letter that has been marked as

23  Exhibit 8.

24    A.  Uh-huh.

25    Q.  Can you find it, Mr. Stapleton?  Try to help if I

1    can.

2         Look at the third paragraph of the letter.  Says,

3    "Sure, you never signed the written agreement I

4    continuously sent you over the years that described our

5    ongoing relationship, like the agreement attached, but

6    we had an agreement nonetheless based on promises,

7    course of dealing, performance, reliance, and perhaps

8    strongest of all, a handshake with honor."

9         Does that accurately describe your relationship

10   with Mr. Johnson?

11              MR. RUMRELL:  Object to the form.

12   A.   No, it does not.

13   Q.   How would you describe that relationship?

14   A.   The relationship was if he procured a valid

15   contract, we would discuss a compensation rate for each

16   individual project.

17   Q.   Is that after he procured it you would discuss

18   the rate?

19              MR. RUMRELL:  Object to the form.

20   A.   Yes.

21   Q.   Okay.  So he would have had to procure the

22   contract first --

23   A.   (Nods head.)

24   Q.   -- before he would be paid; is that correct?

25   A.   Yes.

57

1    Q.  Okay.  And he procured Comfort Zone, correct?

2    A.  Yes.

3    Q.  Okay.  And he procured Garner, correct?

4    A.  Yes.

5    Q.  We discussed the Comfort Zone payment mechanism.

6  What was the Garner payment methodology?

7    A.  Garner was we would split the profit after the

8  costs were done.

9    Q.  Okay.  What -- what was the profit you'd split?

10   A.  It varied.

11   Q.  Okay.  It varied based on what?

12   A.  How much rental equipment Garner continued to

13  use.

14   Q.  Okay.  And this was rental equipment they were

15  leasing from you?

16   A.  Yes.

17   Q.  Okay.  Did you ever provide Mr. Johnson any

18  accounting as to the profits?

19   A.  No.

20   Q.  Okay.  How would he have known the profit split?

21   A.  We gave him that verbally.

22   Q.  So he trusted you?

23          MR. RUMRELL:  Object to the form.

24   A.  I don't know what he did.

25   Q.  Okay.  Did you pay him the correct profit split?

58

1    A.  Yes, we did.

2    Q.  Okay.  And no monies are owed under Garner you

3    think?

4    A.  No, I know there's no money owed.

5    Q.  Okay.  And you don't think monies are owed under

6    Comfort Zone?

7    A.  They are not owed under Comfort Zone.

8    Q.  You say that pretty adamantly.  Have you looked

9    it up recently?

10   A.  We paid -- when we made these payments, they were

11   made in the same timing and the same manner as Comfort

12   Zone made their payments.

13   Q.  Okay.

14   A.  For the same -- under the same mechanism, 10

15   percent of the rental showers.  That was all provided to

16   him in my October 3rd response.

17   Q.  Okay.

18   A.  That's why I'm adamant.  Those dollars that were

19   paid -- we, in fact, overpaid Mr. Johnson by about

20   $30,000 for services that we were anticipating to be

21   provided in '06 that never were provided.

22   Q.  Okay.  Have you done anything regarding recovery

23   of those services, recovery of the overpayment?

24   A.  No, other than responding in my October letter.

25   Q.  Okay.  Prior to Hurricane Katrina, had Deployed

1    done any work with Clearbrook?

2       A.   No, we had not.

3       Q.   Okay.  When was the first time Deployed met

4    Clearbrook?

5            MR. RUMRELL:  Before another area, we really

6       should take a break.

7            MR. NICHOLAS:  That's -- you just have to

8       interrupt and tell me if he needs a break.

9            MR. RUMRELL:  That's why -- I just -- I

10      thought we were pretty much under a standard process

11      that we'd take one about every hour.

12           MR. NICHOLAS:  That's fine.

13           MR. RUMRELL:  Do you want to try to take a

14      lunch break now, since it's a quarter of 12:00?

15           MR. NICHOLAS:  It's up to you.

16           MR. RUMRELL:  Do you want to finish this

17      line of questioning and then we take a lunch break,

18      because he's going into a whole new area.  That's

19      why I'm just asking the question.

20           Whatever your preference is.  Or we take a

21      break and we continue for a while and then take a

22      lunch break.  Whatever --

23           MR. NICHOLAS:  I'll defer to you,

24      Mr. Stapleton.

25           MR. RUMRELL:  Whatever works for you.  But I

1    think it's -- we've been going over an hour and a

2    half.

3              THE WITNESS:  Do you want to take a few

4    minutes break and --

5              MR. RUMRELL:  Yeah, that's fine.  Then we'll

6    come back and finish and then finish your new line

7    of questioning and then we'll take a lunch break.

8    How's that?

9              THE VIDEOGRAPHER:  We are going off the

10   record.  The time is 11:49.

11             (Brief recess.)

12             THE VIDEOGRAPHER:  We are back on the

13   record.  The time is 11:58.

14   BY MR. NICHOLAS:

15      Q.  Mr. Stapleton, when we took our last break, we

16   were just starting to get into the area of Clearbrook,

17   so just to reorient you.

18      A.  Okay.

19      Q.  Before Hurricane Katrina, had you ever done --

20   Deployed done any work for Clearbrook?

21      A.  No, we had not done any work.

22      Q.  What is the business of Clearbrook?  What do they

23   do?

24      A.  A number of things.  From what I know, they

25   provide modular housing.  They provide water and

1  wastewater treatment, temporary facilities.

2      Q.  Okay.  Is their base of operations Alabama?

3      A.  Mobile, Alabama.

4      Q.  Yes.  Does Deployed provide -- does Deployed

5  provide the modular housing?

6      A.  No, we do not.

7      Q.  How did Deployed become acquainted with

8  Clearbrook?

9      A.  I met Bruce Wagner at his Mobile office, had a

10  meeting with him about working together.

11      Q.  What was the background of the meeting?  Did you

12  call him, he call you?

13      A.  No.  I called him.

14      Q.  Okay.  How did you get his name?

15      A.  From Ray Hamlin.

16      Q.  I think you testified Ray was one of your

17  employees, correct?

18      A.  Yes.

19      Q.  And where did Ray get his name?

20      A.  Ray got his business card at the Mobile Hurricane

21  Conference.

22      Q.  Would that be the conference that Richard Cheek

23  invited you to go to?

24      A.  Yes.

25      Q.  But you didn't go to that conference, correct?

1    A.  No, I did not.

2    Q.  Was Mr. Napior there?

3    A.  No, he was not.

4    Q.  Was the only Deployed employee there Ray Hamlin?

5    A.  Yes, he was.

6    Q.  Was Chuck Johnson there?

7    A.  I believe he was.

8    Q.  Okay.  Did Chuck Johnson request that you send

9    Ray Hamlin to the conference?

10   A.  No, he did not.

11   Q.  How did Ray Hamlin end up going to the

12   conference?  What were the circumstances surrounding

13   that?

14   A.  I wasn't available to go.

15   Q.  What was Ray Hamlin's duties at the conference?

16   A.  To see what equipment was there, what people we

17   might be able to work with.

18   Q.  Did Ray see Richard Cheek at the conference?

19   A.  I don't know.

20   Q.  Okay.  Do you know if Ray met Eric Tolbert at the

21   conference?

22   A.  I don't know.

23   Q.  Okay.  How soon after the conference did you call

24   Bruce Wagner?

25   A.  Two or three weeks.

1    Q.  And that was prior to Hurricane Katrina, correct?

2    A.  Yes, it was.

3    Q.  Do you know if PBS&J had a booth at the

4  conference?

5              MR. RUMRELL:  Object to the form.

6    A.  I don't know.

7    Q.  Okay.  Do you know of PBS&J's relationship with

8  Clearbrook at the time of the conference?

9    A.  No, I don't.

10   Q.  Okay.  Do you know if PBS&J had a teaming

11  agreement with Clearbrook at the time of the conference?

12   A.  No, I don't.

13   Q.  Is that a term of art in your industry, "teaming

14  agreement?"

15   A.  What was the question?

16   Q.  Is that a frequent term, a common term in your

17  business, "teaming agreements?"

18   A.  Yes, it is.

19   Q.  What does that mean?

20   A.  It means you team together for a particular

21  project, two -- two non-related -- two non-related

22  entities and they remain non-related even for the

23  benefit of that contract.

24          They're independent of each other, but they're

25  each doing their specific services, and they're teaming

1    together to provide an aggregate benefit to whatever

2    that contract or proposal happens to be.

3        Q.  Have you had any discussions with Richard Cheek

4    prior to the conference that PBS&J would be there at the

5    conference?

6            MR. RUMRELL:  Object to the form.

7        A.  No, other than the e-mail.

8        Q.  Okay.  Richard Cheek did invite you to come see

9    the working pods, I believe, was his terminology.

10            Do you recall that e-mail?

11        A.  You showed it to me.

12        Q.  Okay, but you also said you didn't understand

13    what that actually meant, the working pods; is that

14    correct?

15        A.  No, I don't know what that could mean.

16        Q.  Okay.  Could it mean the modular units, the cogen

17    units?

18        A.  It could.

19        Q.  Okay.  Does Ray recall how he was introduced to

20    Bruce Wagner?

21            MR. RUMRELL:  Object to the form.

22        A.  I believe he went to his booth and saw the water

23    and wastewater treatment equipment, which was directly

24    related to the work we do for the military, and he

25    called me and said this is a very unique product and

1  it'd be -- it'd be good to look into it.

2     Q.  Clearbrook doesn't provide the base camps like

3  Deployed provides; is that correct?

4           MR. RUMRELL:  Object to the form.

5     A.  I don't know what Clearbrook provides.

6     Q.  Okay.  When you met with Bruce Wagner, did you

7  learn what Clearbrook provides?

8     A.  He told me he could do his own base camps, but he

9  was looking for additional capability.

10    Q.  Do you know if Clearbrook had ever provided base

11 camps before?

12    A.  No, I don't know.

13    Q.  Okay.  Were there other companies in the country

14 at that time that provided base camps?

15    A.  Yes.

16    Q.  Who were some of those other companies?

17    A.  KBR, Case Cascade, Base Logistics, multiple tent

18 contractors do base camps.  There's a number of firms in

19 California that do forest fire base camps.  There's

20 probably 20 or 30 that are awarded contracts each year.

21    Q.  Okay.  At the time of the meeting with Bruce

22 Wagner, Deployed had never provided an emergency base

23 camp; isn't that correct?

24           MR. RUMRELL:  Object to the form.

25    A.  We provide base camps.

1      Q.   Okay.  But never as part of an emergency,

2   correct?

3                MR. RUMRELL:  Object to the form.

4      A.   We provide them as military contracts.

5      Q.   Okay.  Before Hurricane Katrina, can you describe

6   for me all military contract base camps you've ever

7   provided?

8      A.   If you -- you want an accurate list, I'm going to

9   have to ask you to -- I don't know if we turned over any

10  information on the job -- job lists.  I can go from

11  memory, but I may miss --

12     Q.   That's fine, sir.  Just approximate.  I don't

13  have to --

14               MR. RUMRELL:  We answered those in

15          interrogatories.  Do you have those with you?

16               MR. NICHOLAS:  I was waiting to hear his

17          answer right now.

18               MR. RUMRELL:  Okay.  I have interrogatories

19          with me, if that's what you need.

20               THE WITNESS:  Can you repeat the question?

21  BY MR. NICHOLAS:

22     Q.   Yeah, I just wanted to know an approximate number

23  or how many military base camps were provided by

24  Deployed before Hurricane Katrina.

25     A.   Oklahoma --

1          MR. RUMRELL:  Let me object to this being a

2     memory test.  But go ahead.

3          THE WITNESS:  Okay.  Oklahoma in 2001.

4     Prior to 2001, I did one as a -- as myself as an

5     individual company in 2000.

6  BY MR. NICHOLAS:

7     Q.  What was the name of that company, sir?

8     A.  Stapleton Construction.

9     Q.  Are you a contractor, Mr. Stapleton?

10    A.  I'm not sure what you're asking.  What do you

11  mean "a contractor?"

12    Q.  Do you have any -- do you hold any licenses in

13  connection with the State of New York?

14    A.  No.

15    Q.  Do you hold any licenses other -- for any type of

16  professional services?

17    A.  No.

18    Q.  Okay.  You don't have a plumbing license, a

19  contractor's license, a --

20    A.  No, it's not required in New York.

21    Q.  Okay.  So, Stapleton Construction did a base

22  camp.

23    A.  In 2000.

24    Q.  Describe that operation.  What did you do?

25    A.  Provided tents, showers, kitchens, laundries,

1    copy machines, generators, air conditioning, cots,

2    on-site management, setup, installation, gray water

3    management, potable water distribution, forklifts,

4    rental -- light tower rental.

5        Q.  Who was the recipient of those service?

6            MR. RUMRELL:  I don't think he's finished

7        with his answer yet, Mr. Nicholas.  So let him

8        finish, if you would, please, sir.

9            THE WITNESS:  We did different service --

10       along with a few other items we provided.  And site

11       restoration.

12   BY MR. NICHOLAS:

13       Q.  Okay.

14       A.  What was your question again?

15       Q.  Who was the recipient of those services from

16   Stapleton Construction?

17       A.  The New York National Guard.

18       Q.  What was the value of that contract?

19       A.  $725,000.

20       Q.  And what did you do for Oklahoma -- in Oklahoma

21   in 2001?

22       A.  Provided a base camp.

23       Q.  Okay.  And who was the recipient of that?

24       A.  Oklahoma National Guard.

25       Q.  What was the value of that contract?

1      A.  $724,000.

2      Q.  Are there any other military contracts that

3  were --

4      A.  Yes.

5      Q.  Okay.

6      A.  In 2002, another Oklahoma contract, this time

7  Fort Polk, Louisiana.

8          In 2002, we provided meals to the Arkansas

9  National Guard, temporary kitchens and turnkey food

10  service.

11          In 2003, we provided equipment rentals to KBR and

12  to a tent company for -- for operation Enduring

13  Freedom -- the Iraqi Freedom and Enduring Freedom.

14          And we provided, in '04 -- I don't recall now.

15  '04 was -- we provided work for Ft. Benning, for Ft.

16  Campbell, for JRTC at Ft. Polk, State of Mississippi,

17  Mississippi National Guard.  And I can't recall --

18      Q.  Okay.  That's fine, sir.  Of those contracts

19  you've just identified for me, which ones are base

20  camps?

21      A.  The two Oklahoma contracts were base camps, and

22  the 2000 contract was a base camp.

23      Q.  Stapleton Construction contract?

24      A.  Yes.

25      Q.  Okay.  So, prior to Hurricane Katrina, Deployed

1   and/or Stapleton Construction had provided base camps

2   pursuant to three contracts with the military; is that

3   correct?

4       A.  It might be.  Without looking at my records,

5   Mr. Nicholas, I can't tell you that --

6       Q.  Okay.

7       A.  -- definitely.

8       Q.  Okay.  Now, when you met with Mr. Wagner, did you

9   meet with him in Alabama?

10      A.  Yes, at his office.

11      Q.  Okay.  I guess you flew over there or something?

12      A.  We were -- we were down at our project site for

13  showers for Hurricane Dennis in the panhandle, and we

14  went from there to Mobile and met with Mr. Wagner.

15      Q.  Okay.  And your site for Hurricane Dennis, those

16  were the showers you just referenced; is that correct?

17      A.  Duke Field in wherever that is -- it's near Ft.

18  Walton Beach.  I don't remember the exact town.

19      Q.  That's fine.  Okay.  And that was --

20      A.  Crestview.

21      Q.  And wasn't that work that Chuck Johnson procured

22  for you, that shower work?

23      A.  Yes, that was.  That was Comfort Zone work.

24      Q.  Okay.  Now, who actually went to see Bruce

25  Wagner?  Was it just you or anybody else?

1      A.   Myself and Ray Hamlin.

2      Q.   How long was the meeting?

3      A.   Probably two hours, maybe a little less.

4      Q.   Were you in his office the whole time?

5      A.   His conference room.

6      Q.   Did you, like, do lunch with him or anything?

7      A.   No.

8      Q.   Do you recall the substance of the discussions

9   with him?

10      A.   Doing base camps for him, working for a contract

11   he had for Georgia Power & Light to help him set up his

12   hard-wall structures.

13      Q.   Okay.  So, he had a contract with Georgia Power &

14   Light at the time?

15      A.   I don't know if he did.  That was a contract -- a

16   project he asked us if we could support him on.

17      Q.   Okay.  Do you know if that Georgia Power & Light

18   contract was through PBS&J?

19      A.   No.  I have no idea.

20      Q.   Was anybody from PBS&J there?

21      A.   No.

22      Q.   Did he discuss PBS&J at all during the meeting?

23      A.   No.

24      Q.   Did he have any of the cogen units on his site?

25      A.   I don't recall.  He had a steel unit that he

1    manufactured himself.

2        Q.  Did you provide Bruce Wagner with any references?

3        A.  I don't recall.  We just discussed what projects

4    we had worked on.

5        Q.  Would it be unusual for you not to provide him

6    references?

7            MR. RUMRELL:  Object to the form.

8        A.  Well, contract wins, they illustrate capable past

9    performance.  By him seeing our list of contracts we had

10   supported, he felt it was beneficial to -- we had

11   synergies.

12       Q.  Okay.  So, you would have presented him some type

13   of a written proposal; is that correct?

14       A.  No.

15           MR. RUMRELL:  Object to the form.

16       A.  No.

17       Q.  Would you have given him anything in writing to

18   reflect your qualifications --

19       A.  No.

20       Q.  -- or expertise?

21           It was strictly oral?

22       A.  Yes.

23       Q.  Do you know if Clearbrook pulled any credit

24   history on Deployed Resources?

25       A.  I have no idea.

1      Q.  Did he inquire as to how long you've been in

2  business?

3      A.  Yes.

4      Q.  Did he ask for any bank account information?

5      A.  No.

6      Q.  To the best of your knowledge, did Wagner do any

7  type of investigation as to Deployed Resources?

8           MR. RUMRELL:  Object to the form.

9      A.  I don't know.

10      Q.  At the conclusion of the meeting -- you said Ray

11  Hamlin was there, I believe you --

12      A.  Yes.

13      Q.  Did Ray discuss anything at the meeting?

14      A.  No.

15      Q.  At the conclusion of the meeting, what was the

16  end result?

17      A.  We were going to stay in contact to see when he

18  was going to do a training session to work with his

19  hard-wall buildings and we were going to look into -- we

20  were going to look into further opportunities for his

21  wastewater treatment units.

22      Q.  Okay.  Describe for me what those opportunities

23  for his wastewater treatment units would have been.

24  What does that mean?

25      A.  Well, if we went and did a base camp or

74

1    another -- or a shower job, we were looking to purchase

2    one of his treatment units to be able to offset the cost

3    of transporting wastewater off site.

4        Q.  Yes, sir.  Did you give him any, like, price

5    structures, pricing information about your product or

6    your services?

7        A.  No, we did not.

8        Q.  And at no time did he state any connection that

9    Clearbrook had with PBS&J?

10       A.  No, I don't believe he did.

11       Q.  Would you have remembered it if he did?

12       A.  I don't know.

13       Q.  Okay.  Related to Hurricane Katrina, how many

14   weeks or months was that meeting with Bruce Wagner in

15   terms of was it prior to, how many weeks or months?

16           MR. RUMRELL:  Object to the form.

17       A.  Probably three or four.

18       Q.  Three or four weeks?

19       A.  Yes, three or four weeks.

20       Q.  Is it fair to say that you would have been

21   meeting with PBS&J in that three to four-week period as

22   well?

23       A.  Yes.

24       Q.  That could have been the August meeting with the

25   August agenda, correct?

1     A.  Would have been, yes.

2     Q.  Do you know if PBS&J ever provided a reference

3  for you to Clearbrook?

4     A.  No, I do not.

5     Q.  What do you know about Eric Tolbert?

6          MR. RUMRELL:  Object to the form.

7     A.  He was a Senior Vice-President for Risk and

8  Emergency Management at PBS&J.

9     Q.  When was the first time you ever heard his name?

10          MR. RUMRELL:  Object to the form.  He's

11      already answered that question.

12     A.  When either Richard Cheek or Eric Tolbert himself

13  called me regarding this contract --

14     Q.  Okay.

15     A.  -- South Carolina contract.

16          MR. RUMRELL:  Exhibit -- what was that?

17          THE WITNESS:  Exhibit 5.

18  BY MR. NICHOLAS:

19     Q.  Do you recall when that call would have been

20  made?

21     A.  Sometime prior to the bid date.

22     Q.  Okay.  Do you recall speaking to PBS&J as to your

23  meetings with Clearbrook?

24     A.  No.

25     Q.  After you concluded your meeting with Bruce

· 76

1    Wagner, when was the next time you heard from him again?

2        A.   I contacted him a couple of weeks later for a

3    Navy proposal we were bidding that had a requirement for

4    modular facilities.

5        Q.   And you said it was a few weeks later?

6        A.   I would have to look up the exact dates.

7        Q.   But you do recall that you called him; is that

8    correct?

9        A.   I called him, yes.

10       Q.   What was your source for the Navy proposal?

11            MR. RUMRELL:   Object to the form.

12       A.   What do you mean "the source?"

13       Q.   Was that procured by Mr. Johnson?

14       A.   It was public contract that came out in the

15   public bid net.

16       Q.   Okay.   What was the Navy base proposal for?

17       A.   Key West Naval Air Station.

18       Q.   Do you know if Mr. Wagner submitted any type of

19   proposal?

20       A.   What are you asking me?

21       Q.   You contacted Mr. Wagner to let him know of the

22   possibility that there was potential work in Key West;

23   is that correct?

24            MR. RUMRELL:   Object to the form.

25       A.   No.

1              MR. RUMRELL:  It's not his testimony.

2     Q.  Okay.  Perhaps you can correct me.  What was your

3   discussion with Mr. Wagner?

4     A.  I called him and asked him for a price for a

5   certain amount of containerized units --

6     Q.  I see, okay.

7     A.  -- and verified delivery dates so I can include

8   that in my proposal to the Navy.

9     Q.  I understand.  Do you recall the -- by "the

10  units," are we talking the "cogen units?"

11    A.  No.

12    Q.  What type of units are we discussing?

13    A.  His mobile housing unit, his --

14    Q.  Okay.

15    A.  -- containerized housing unit that he

16  manufactured.

17    Q.  Did he provide you that information?

18    A.  Yes, he did.

19    Q.  And the proposal was submitted?

20    A.  Yes, it was.

21    Q.  Was a contract awarded?

22    A.  No.

23    Q.  Is Deployed licensed to do business in Florida?

24    A.  Yes, we are.

25    Q.  When was the next time after that you had a

1    discussion with Wagner?

2        A.  He called me for Hurricane Katrina base camps.

3        Q.  Okay.  Was that before Katrina or after Katrina

4    in terms of the storm hitting?

5        A.  Three days prior to landfall.

6        Q.  Okay.

7        A.  Or maybe two or three days prior to landfall.

8        Q.  And by landfall, is that landfall at New Orleans

9    or landfall in Florida?  Would you --

10       A.  That was landfall in New Orleans.

11       Q.  Okay.  So he called you; is that correct?

12       A.  Yes.

13       Q.  Did he ask you for references at all?

14       A.  No.

15       Q.  Okay.  And the purpose of his call was to what?

16       A.  Ask us how many base camps we could provide to

17    him.

18       Q.  Why did he need base camps?

19       A.  I don't know.

20       Q.  Do you know if he had some -- "he" being

21    Clearbrook -- had some contract with FEMA at the time?

22       A.  He did have a contract.

23       Q.  Okay.  But before landfall?

24       A.  I don't know the specific dates that he had -- he

25    was committed prior to landfall.

1      Q.   Okay.  You're pretty sure about that?

2      A.   No, I'm not, not without looking at my files.

3      Q.   Okay.  Do you know what all -- the specifications

4    of his contract with FEMA?

5      A.   Just to provide turnkey base camps for first

6    responders.

7      Q.   Okay.  Do you know the amount of the contract?

8      A.   No, I do not.

9      Q.   How many base camps did he need?

10     A.   He didn't know.

11     Q.   How many base camps were ultimately provided?

12            MR. RUMRELL:  By Deployed?

13            MR. NICHOLAS:  Yes, sir.

14            THE WITNESS:  To who?

15   BY MR. NICHOLAS:

16     Q.   To -- yeah, I would say in connection with

17   Hurricane Katrina to anyone.

18     A.   I think there were 60 or 70 camps.

19     Q.   And these were camps -- all camps provided by

20   Deployed?

21     A.   No.  You said camp provided to anyone.

22     Q.   Well, but how many camps did Deployed provide?

23     A.   Deployed provided -- we provided seven or eight.

24     Q.   Do you remember the locations of those camps?

25     A.   All right.  We had -- we had Pineville.  We had

1  EOC in Baton Rouge.  We had Port Allen.  We had the

2  fairgrounds in Baton Rouge.  We had Sherwood Forest.

3  And we had New Orleans.  Those were the only three

4  Clearbrook contracts, six camps.

5      Q.  Okay.  Did Deployed have a written contract with

6  Clearbrook?

7      A.  We had a one-pager that -- that Bruce was going

8  to use us for base camps for his responder contract.

9      Q.  Has that one-pager been provided in connection

10  with the discovery in this case?

11     A.  Yes, it has.

12     Q.  Does the one-pager show pricing structures,

13  things of that nature on it?

14     A.  No, it does not.

15     Q.  How would Bruce have known the pricing structure

16  without that information being provided?

17     A.  Because he didn't have an identified requirement

18  as far as -- for what FEMA wanted from him.  When they

19  asked, he would ask us for pricing.  We would provide a

20  price quote at that time.

21     Q.  Okay.  How many times did he ask you for price

22  quotes?

23     A.  Many.  I don't know the specific number.

24     Q.  Okay.  Was Clearbrook always current on their

25  bills?

1    A.   There were some delays.

2    Q.   And in terms of dollar amount, the delays?

3    A.   Three or four million.

4    Q.   I mean, that's a substantial sum of money for a

5  small business; wouldn't you agree with that?

6    A.   Well, look at the level of effort that was

7  required to support all that work.

8    Q.   Let me hand you a copy of a document.

9        (Exhibit 9, 4/25/06 Letter from Deployed

10  Resources, LLC, marked.)

11  BY MR. NICHOLAS:

12    Q.   Please read the document for me.

13        THE VIDEOGRAPHER:  We have six minutes left

14     on the tape.

15        MR. NICHOLAS:  Thank you.

16        THE VIDEOGRAPHER:  You're welcome.

17        THE WITNESS:  Okay.

18  BY MR. NICHOLAS:

19    Q.   Does that document, Mr. Stapleton, just marked as

20  Exhibit Number 9, reflect the payment dispute that

21  Deployed had with Clearbrook?

22        MR. RUMRELL:  Object to the form.

23    A.   There was no dispute.  It was a delay.

24    Q.   Uh-huh.  Did Clearbrook ever cure the arrearages?

25    A.   Yes.

1      Q.   Okay.

2              MR. RUMRELL:  We're at out 12:30 time.  It's

3      a good time to take a break.

4              MR. NICHOLAS:  That's fine.

5              THE VIDEOGRAPHER:  We are going off the

6      record.  The time is 12:30.  This is the end of tape

7      one.

8              (Lunch recess.)

9              THE VIDEOGRAPHER:  We are back on the

10     record.  The time is 1:29.  This is the beginning of

11     tape two.

12  BY MR. NICHOLAS:

13     Q.   Mr. Stapleton, when we left off just before the

14     break, you just identified for me Exhibit Number 9.

15     Let's get back to that exhibit.

16          Do you recall looking at that exhibit right

17     before the break, sir?

18     A.   Yes, I do.

19     Q.   And this exhibit represents a payment dispute you

20     were having with Deployed Resources, correct?

21              MR. RUMRELL:  Object.

22     A.   No.

23     Q.   No dispute?

24     A.   No.

25              MR. RUMRELL:  Object to the form.

1    A.   Deployed Resources --

2    Q.   I'm sorry.  It represents a payment dispute you

3    had with Clearbrook, correct?

4              MR. RUMRELL:   Object to the form.

5    A.   Correct.

6    Q.   Okay.  On the second page of this exhibit --

7    A.   Uh-huh.

8    Q.   -- there's a list of invoices, invoice number,

9    amounts, period, status.

10   A.   Correct.

11   Q.   Does that block accurately reflect the invoices

12   that were outstanding as of the date of that letter?

13   A.   Yes.

14   Q.   Okay.  If you'd look to the first page of the

15   letter --

16   A.   Uh-huh.

17   Q.   -- the third paragraph where it states "We

18   realize that your contract has undergone an inspector

19   general audit that was initiated on or about 12 November

20   2005," do you see that statement, sir?

21   A.   Yes.

22   Q.   The next sentence states, "We forwarded all

23   information you requested of us immediately to allow you

24   timely responses to your claim."

25        What information would you have forwarded

84

1    Clearbrook?

2        A.    Copies of invoices that he had requested.

3        Q.    Any other information other than invoices?

4        A.    Not that I know of, not that I recall.

5        Q.    Would you have produced that same information in

6    connection with this lawsuit?

7        A.    Yes, I would.

8        Q.    Okay.

9               MR. NICHOLAS:  John, do you have a copy of

10       that?

11              MR. LEVCHUK:  Yes.

12              (Exhibit 10, Clearbrook, LLC, Statement of

13       Account, marked.)

14   BY MR. NICHOLAS:

15       Q.    Mr. Stapleton, I'm going to show you what's been

16   marked as Exhibit Number 10.  Please take a look at that

17   document.

18       A.    Okay.

19       Q.    Mr. Stapleton, look at the second page of the

20   document for me.

21       A.    Uh-huh.

22       Q.    And at the bottom of the chart, it states, "Total

23   $72,793,958.64."

24              Do you see that number?

25       A.    Yes.

1    Q.   What does that number reflect?

2    A.   The sum of all those columns of all those

3    individual invoices.

4    Q.   So, that would be the gross billings in

5    connection with --

6    A.   Yes.

7    Q.   Okay.  So, this number, the $72,793,958.64 --

8    A.   Uh-huh.

9    Q.   -- would be the gross sales derived from the

10   Clearbrook relationship?

11            MR. RUMRELL:   Object to the form.

12   A.   I'm not sure what you're asking.  Could you

13   repeat the question?

14   Q.   Sure.  Would this reflect the total billings

15   associated with the Clearbrook project?

16   A.   Yes.

17   Q.   Okay.  Is there any columns or anything in the

18   statement that are incorrect, to the best of your

19   knowledge?

20   A.   Without having invoices, I would not know.  Okay.

21   Q.   Is this a document that was prepared by Deployed?

22   A.   Yes, it was.

23   Q.   Okay.  Who in your office would have prepared

24   this document?

25   A.   I did.

1       Q.   That can --

2               (Exhibit 11, Deployed Resources, LLC, Income

3    Statement, marked.)

4    BY MR. NICHOLAS:

5       Q.   Mr. Stapleton, I'm showing you a document that we

6    just marked as Exhibit Number 11.

7               Would you look at these documents for me?

8               MR. RUMRELL:  We're designating this

9          deposition as confidential under --

10              MR. NICHOLAS:  I understand.

11              MR. RUMRELL: -- our agreement.

12              MR. NICHOLAS:  Okay.

13              THE WITNESS:  Okay.

14   BY MR. NICHOLAS:

15      Q.   Yes.  Looking at the first page where it states

16   "Deployed Resources, LLC, Income Statement For The

17   12 Months Ending December 31st, 2005," do you see that

18   page, Mr. Stapleton?

19      A.   Yes.

20      Q.   Under the year to date column for total revenues,

21   it lists 44,365,130.39.  Do you see that number?

22      A.   Yes.

23      Q.   Is that number an accurate reflection of the

24   total revenues received in that particular year?

25      A.   I don't know.

1    Q.  Okay.  Who would have prepared this statement?

2    A.  It could have been our former CPA or it could

3  have been my former -- or my partner, Mike Frisch.

4    Q.  Okay.

5    A.  I do not know who prepared this statement.

6    Q.  Okay.  Of the total revenue reported, the

7  44,365,130.39, what is the approximate amount of that

8  sum that is attributable to Clearbrook?

9    A.  I don't know.

10   Q.  Who would know that answer?

11   A.  I would be able to get an answer, but I would

12  have to look at other sales information.

13   Q.  Okay.  Turning the page, the second page is

14  titled "Deployed Resources, LLC, Income Statement for

15  the 12-month Period Ending December 31st, 2006."

16       The total revenue column shows a total revenue of

17  37,411,159.77; is that correct?

18   A.  What was that again?

19   Q.  Is that a correct -- is that the correct number

20  reported as total revenue on the statement?

21   A.  I don't know.

22   Q.  Okay.  You have no idea if that number is correct

23  or not?

24   A.  No, I do not.

25   Q.  Okay.  And, again, the only person with

88

1   information as to whether that number is correct ...

2       A.   That would be me, our former accountant, or my

3   partner, Michael Frisch, but he -- I don't know that he

4   would be able to -- these statements, without looking at

5   our tax return --

6       Q.   Yes, sir.

7       A.   -- I can't tell you if that is the exact same

8   number as our tax return or not.

9       Q.   Okay.  Tell me the steps you could employ to

10  verify if that's the correct number for me.

11      A.   I would look at our tax return for this -- for

12  this year ending 2006.

13      Q.   Okay.  So, that should be the same statement in

14  the tax return?

15      A.   Our tax return for the years of 2005 and 2006 are

16  our -- that's our official legal statement.  We had --

17  those are our official -- that's our official financial

18  statement --

19      Q.   Okay.

20      A.   -- would be our tax returns.  And without having

21  those here, I could not verify if this is the same

22  number as that.

23      Q.   Have the tax returns been provided in this case?

24      A.   I don't know if -- I believe those were -- I do

25  not know.

89

1    Q.   If you don't know, you don't know.

2    A.   I don't know.

3    Q.   That's fine.

4         Looking at 2005 --

5    A.   Uh-huh.

6    Q.   -- and the $44,000,000 sum, would that sum

7    include any monies that were posted that year from

8    Clearbrook?

9    A.   Yes, it would.

10   Q.   Okay.  And for 2006, the same question, would the

11   $37 million total revenue sum also include monies posted

12   from Clearbrook?

13   A.   Yes, it would.

14   Q.   Okay.  Look to the third page for me.

15        Do you see that page, Mr. Stapleton?

16   A.   Yes.

17   Q.   Who would have prepared this document?

18   A.   I have no idea.

19   Q.   Is it something you would have prepared?

20   A.   No.

21   Q.   Okay.  You'd agree it appears to be some type of

22   recon -- some type of comparison of 2005, 2006?  Do you

23   see that?

24   A.   Yeah, I can see that.

25             MR. RUMRELL:  Do you know where the Bates

1      stamp number would be on this?

2           MR. NICHOLAS:  It would have been in the

3      documents you provided.  We --

4           MR. LEVCHUK:  I prepared this.

5           MR. NICHOLAS:  Oh, you did?

6           MR. LEVCHUK:  Yes.

7           MR. NICHOLAS:  I stand corrected.

8           THE WITNESS:  I've never seen this in my

9      life.

10          MR. NICHOLAS:  I stand corrected.  Noted.

11     Appreciate that.  Let me ask you --

12          MR. LEVCHUK:  I can put a Bates stamp on it,

13     if you like.

14          MR. NICHOLAS:  We'll do that.

15          MR. RUMRELL:  Well, it's just not part of

16     the same document.  That's why I'm -- I'm a little

17     troubled by --

18          MR. LEVCHUK:  No, it was --

19          MR. NICHOLAS:  That's fine.  That's fine.

20     BY MR. NICHOLAS:

21     Q.  Let me ask you this question, Mr. Stapleton:  If

22     you look at the documents that apparently Deployed had

23     some involvement with in terms of preparing the income

24     statements, for the total revenue of the December 31st,

25     2005 and the total revenue for December 31st, 2006 --