UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNLIMITED RESOURCES INCORPORATED,
A Florida Corporation,

    Plaintiff,

v.                                         Case No.: 3:07-cv-961-J-I2MCR

DEPLOYED RESOURCES, LLC.,
A foreign limited Liability Company,

    Defendant.
_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

Plaintiff, Unlimited Resources Inc. ("Unlimited"), by and through its undersigned attorneys, hereby responds to Defendant's dispositive motion for summary judgment and memorandum of law by saying as follows[1]:

### I.    RESPONSE TO INTRODUCTION

<u>There "is" a contract between Unlimited and Deployed for "something"</u>

Before the national tragedy of September 11, 2001, Depoyed's president, Richard Stapelton ("Stapleton") "called" Unlimited's president, Chuck Johnson ("Johnson") to "get involved" in emergency disaster work (Johnson Depoistion, p 26 [Lines 4-25], p. 27, p.28 [Lines1-10][2]; See also Unlimited Supplemental Aff.¶2, attached hereto as Ex. No. "1"). Johnson had 25 years of national disaster expertise; Johnson had worked in both the public and private sector coordinating national emergency disaster relief on behalf of

---

[1] At the outset, the Court should note that Deployed is only seeking summary judgment as to Count I (breach of contract) and Count III (accounting). Deployed is not seeking summary judgment as to Count II (unjust enrichment) which is not necessarily dependent on the existence of contract as set forth in Plaintiff's motion for summary judgment. Ironically, Defendant's MSJ actually supports Plaintiff's MSJ that Unlimited conferred "benefit" to Deployed under the tenets of unjust enrichment.

[2] The Deposition of Johnson, without errata sheet, was previously filed by Defendant in support of previous and current motions for summary judgment. All other referenced depositions are of record.

state and federal governmenetal entities, inlcuding but not limited to the Department of Defense, FEMA, the Department of Community Affairs, the Division of Emergency Mangement, and the National Red Cross, where he was the regional director disaster operations (Doc. No. 100, Ex. No. "1",Unlimited Aff. ¶¶ 6-8, previoulsy filed as Ex. No. 1 to Plaintiff's previous MSJ; Doc. No. 88-2, Am. Complaint ¶10; Johnson Deposition, Ex. No. 26). In contrast, Deployed had "no emergency disaster expertise of any kind" to procure emergency business (Doc. No. 100, Ex. No. "1", Unlimited Aff. ¶8,). Rather, Deployed was a service provider for music festivals (Id., ¶ 4).

Deployed wanted to get into the emergency disaster business and needed the expertise and contacts of Johnson who founded Unlimited after he left the public sector (Id., Unlimited Aff. ¶4; Doc. No. 88-2, Am. Complaint ¶¶2,4). Unlimited markets the services of parties seeking to obtain emergency disaser work (Doc. No. 100, Ex. No. "1", Unlimited Aff. ¶2). The services include consulation, brokerage, vetting, and business procurement by Unlimited (the "Unlimited Marketing Services") (Id.). In connection therewith, Unlimited utilizes the unique disaster expertise (the "Unlimited Expertise") and professional relationships (the "Unlimited Network") acquired by Johnson, which he developed and carefully cultivated over his professional career (Id.) Thus, in its simplest sense, Unlimited brings buyers and sellers of emergency disaster services together and is paid for this marketing and procurement (Id.)

Deployed enaged Unlimited to provide the Unlimited Marketing Services to procure emergency disaster business for the financial benefit of Deployed (Id, ¶9). Deployed represnted, agreed, and promised to pay Unlimited 10% of gross sales derived therefrom, and in any way related to the Unlimited Marketing Services, and for whatever

Unlimited "brought to the table" (Doc. No. 100, Ex. No. 1, Unlimited Aff., ¶¶5, 9, 10; Unlimited Supp. Aff., ¶2, attached herto as Ex. No. "1"). Unlimited also had right to request accounting (Doc. No. 100, Ex. No. 1, Unlimited Aff., ¶9; Unlimited Supp. Aff. ¶2, attached hereto as Ex. No. 1).

Though the agreement was pursuant to discussion, all terms thereof were also reflected in multiple unsigned written agemments that Unlimited provided to Deployed in continuing memorialization (See written agreements attached to Johnson Deposition as Ex. Nos 4-7); Unlimited throughly reviewed all terms of the agreement with Deployed and fully performed the agreement pursuant to the terms, all without "any" objection from Deployed (Doc. No. 100, Ex. No. 10, Unlimited Aff. ¶10; Supp. Aff., ¶3, attached hereto as Ex. No. 1). This is defined in the Unlimited Affidavit (Doc. 100) as the "Agreement" (Doc. No. 100, Ex. No. 1, ¶10).

From a simpler perspective, in terms of offer and acceptance, Unlimited "offered" to market Deployed's services in consideration of Deployed "acceptance" to pay 10 % of "everything" generated, or in the words of Johnson, 10% of everything "brought to the table" (Id., ¶9). Deployed accepted the offered terms and agreed to pay 10% of gross, or everything brought to the table subject to accounting (Id., ¶9). Thus, in terms of simplicty, there was at least "some" basic agreement (the "basic agreement") between the parties to do some specific thing" (Supp. Aff. ¶2, attached hereto as Ex. No. 1). As a result, and in equal terms of simplicty, an agreement to do some specific thing (marketing), creates a contract as matter of law. <u>Kislak v. Kreedian</u>, 95 So. 2d 510 (Fla. 1957). Inherent therewith, was a "meeting of the minds" as to the specific thing to be performed (marketing), with full understanding thereof (payment for the marketing), as

attested by Unlimited (Unlimited Supp. Aff., ¶3, attached hereto as Ex. No. "1"). Therefore, there was legally enforceable contract between the parties as a matter of law. Cohen v. Amerifirst Bank, 537 So.2d 1108,1110 (Fla. 3rd DCA ), rev. den. 547 So.2d 1209 (Fla. 1989)( "meeting of minds" on essential elements is prerequisite to enforceable contract)

Though the original complaint (Doc. No. 1) was amended (Doc. No. 88-2), and Defendant disputes various terms of the agreement (Doc. No. 146, Defendant's MSJ, p. 4) the basic agreement has remained steadfast throughout the case, to wit, that Unlimited agreed to market the services of Deployed and Deployed agreed to pay a perecenatge of the monies generated thereby (Doc. No. 100, Ex. No. 1, Unlimited Affidavit, ¶9; Unlimited Supp. Aff. ¶2, attached hereto as Ex. No. "1"). The Agreement is desrcibed in the original complaint (Doc. No. 1, ¶22); the amended complaint (Doc. 88-2, ¶¶ 14,15), the Unlimited Affidavit (Doc. No. 104, Ex. No. '1", ¶¶ 9,10), which was filed by Unlimited in support or previous motion for summary judgment (Doc. No. 104) "before" the filing of amended complaint was even granted; Plaintiff's response to Defendant's Initial Interrogatories (Doc. No.21, attached to Defendant's Motion to compel); Plaintiff's Response to Defendant's Supplemental Interrogatories (See Plaintiff's answers to interrogatory number 2 and 3 describing the basic agreement, attached hereto as Ex. No. 2); reaffirmed in supplemental affidavit attached hereto as Ex. No. 1 (Supp. Aff., Unlimited, ¶2); testified in deposition of Stapelton (Dep., R. Stapelton, p. 174 [Lines 8-25], p. 175 [Lines 1-23]); discussed at length in Plaintiff's MSJ, Doc. No.144, p.6, ¶7), and, of course, discussed in the following deposition testimony of Unlimited's president (Johnson) from errata sheet (attached hereto as Ex. No. "3", previously filed as Ex. No. 2

to Plaintiff's previous response to Defendant's MSJ), which Deployed is requesting the court to disregard:

> **Q**: Okay. Now, Mr. Johnson, you've alleged in the federal complaint that there is an oral agreement between Deployed Resources and Unlimited Resources.
> **Mr. Nicholas**: Objection to form.
> **Q**: What is the oral agreement?
> **Mr. Nicholas**: You can answer the question. (Dep. C. Johnson, p.11[L9-L15]
> **A**. The basic agreement was that unlimited would obtain business for Deployed for which Deployed agreed to pay Unlimited 10% of gross sales, business, and everything brought to the table by Unlimited (Dep., C. Johnson, Errata Sheet [L. 16-L19])
> **Q**: Any other oral agreements? (Dep., C. Johnson, p. 14 [L.16]
> **A**. There were not multiple oral agreements; rather, there was but one Agreement between the parties, which in turn, was reflected and supplemented by writings and dealings (Dep. C. Johnson, Errata p. 14 [L.17])
> **Q**: Was it during this call that you reached your agreement with Deployed Resources, this oral agreement that you've described.
> **Mr. Nicholas**: Objection to form. You can answer it Chuck (Dep., C. Johnson, p. 31 [L1-L.5])
> **A**. We agreed to all terms of the sent Agreement (Dep., C. Johnson, Errata p. 33 [L.6-L.8])
> **Q**.: All right, so let me ask you this: During the course of the conversation on September 12th, 13th, 14th, whatever it was, that you went over with him and the oral agreement that was contained in something you sent him later; is that right? (Dep. C. Johnson, p. 33 [L.6-L.10])
> **A**. I told him that I was going to send him a copy of an agreement showing terms we had agreed to and on which we would work together. I had used similar agreements in the past with other manufacturers and vendors, and that's what I did (Dep. C. Johnson, Errata, p.33 [L11-L.14])
> **Q**: Okay. So what I'm trying to still understand are what are the terms of the oral agreement that Mr. Stapelton agreed to? (Dep. C. Johnson., p. 33 [L.18-L.20].
> **A**. The basic terms of the Agreement were that Unlimited would receive 10% gross of everything brought to the table for Deployed and that Deployed was to account to Unlimited as to the monies earned. (Dep. C. Johnson. Errata, p. 33 [L. 21]).
> **Q**. Okay. Was there any agreement as part of this oral agreement that Unlimited Resources would share in profits and losses of Deployed Resources? (Dep. C. Johnson, p. 51 [L. 19-L.21]
> **A**. No, only in the sense that the Agreement required that Unlimited be paid 10% gross of everything made by Deployed, which would have

included gross sales and profits from the sales (Dep. C. Johnson, Errata [L. 22]

Q; Is the oral agreement that's referenced in here the only oral agreement that you had, is the one you've described here today?

**Mr. Nicholas:** Objection to form. (Dep. C. Johnson, p.109-111 {L. 25-L3])

A: Yes, we had one Agreement that contained both oral and written terms reflected in writings and performance (Dep. C. Johnson, Errata, p. 109 [L.8]).

Q: You updated the oral agreement? (Dep. C. Johnson, p. p.158 [L.18])

A. As we performed the Agreement, updates were made, but he never objected (Dep. C. Johnson, Errata. P. 158 [L.19-L.21]

Q. So its not 10% of the gross, but 10% of the rental of the equipment (Dep. C. Johnson, p. 217[ L.7-L8]

A. Yes, 10% of gross means 10% of everything, including, but not limited to rentals (Dep. C. Johnson, Errata, p. 217 [9]

Q. Then they would pay 10% of the rental of the equipment on job-by-job basis.

A. Ten percent of the gross on—

Q: Of the rental—of the gross rental—

A. Yeah

Q. –of the equipment—

A. equipment yeah

Q; It was on the rental of equipment (Dep. C. Johnson, p. 218 [L.2-L.14]

A. Yes, 10% was 10% of everything, including but not limited to rentals (Dep. C. Johnson, Errata, p. 218 [L.15]

Q: I am trying to understand what you mean by an oral/written agreement (Dep. C. Johnson, p. 404 [L. 17-L.18])

A. Oral /Written agreement is an agreement that contains oral terms reflected in writings and course of performance that companies use so they don't have to go through attorneys (Dep. C. Johnson, Errata p. 404 [L.19-1.22]

The preceding deposition of Unlimited "affirms" the very basic agreement between the parties, clearly of record, in which Deployed agreed to pay Unlimited 10% of all gross and benefit earned by Deployed as "brought to the table" by Unlimited, which parenthetically, Deployed admits was established through some "course and conduct between the parties (Doc. 146, Defendant's MSJ, p.4). According to Deployed, this deposition testimony of Unlimited must be disregarded because it reflects corrected testimony pursuant to errata sheet (Ex. No. 3, attached hereto).

This argument is contradictory to Fed. R. Civ. P. 30 (e)(1)-(2), which reads as follows:

> (e) Review by the Witness; Changes.
>
> (1) Review; Statement of Changes.
>
> On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
> (A) to review the transcript or recording; and
>
> (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.
>
> (2) Changes Indicated in the Officer's Certificate.
>
> The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

In the present case, Deployed correctly "concedes" that Johnson did not waive reading and requested review. In addition, Deployed correctly "concedes" that Johnson completed the review and signed errata sheet with 30 days. However, the germane dispute is two fold. First, Deployed contends the errata sheet is deficient because "reason for the changes" is not set forth. Second, Deployed contends that the reporter never received the errata sheet. The first point is easily refuted by looking to the top of the errata sheet (Ex No. "3") where on it clearly states the reason for the changes as being "These changes are necessary to ensure correctness of my testimony". The second point is equally refuted by attached affidavit from the undersigned attorney attesting to the delivery to and receipt by the court reporters (Ex. No. "4" attached hereto).

Even assuming the corrected deposition is disregarded (as well as all other matters

of record shoing the basic agreement), Deployed's MSJ "admits" there was "some" agreement between the parties (Doc. No. 146, Defendnats MSJ, pp1-2). As set forth in Deployed's MSJ, after the September 11, 2001 tragedy, the very first work "undisputedly" procurred by Unlimited for Deployed was from Garner Environmental ("Garner") and was subject to the Agreement (Id). It is an undisputed fact Deployed was paying Unlimited 10% of the "gross" that Deployed received from Garner pursuant to some agremeent (Id). It is equally undipsuted that Unlimited sent a written copy of the Agreement that was reflective of the terms discussed inlcuding the 10% of gross (Id). It is equally undisputed that Deployed contacted Unlimited to discuss changing the 10% payment under the Agreement due to unexpected project costs (Id, p.2). Deployed requested that Unlimited reduce the 10% rate to a 50/50 net profit split akin to partners (Id). Unlimited agreed, but the amendment was only for the project at issue (Unlimited Supp. Aff ¶4 attached herto as Ex. No.1). At a minimum, this shows that Deployed had at least "originally" agreed to pay Unlimited 10% of gross pursuant to "some" Agreement, and that Deployed benefitted therefrom, consistent with Plaintiff's MSJ for unjust enrichment (Count II), which is not subject to Deployed's MSJ currently at issue.

As set forth in Deployed's MSJ, the next work "undisputedly" procurred by Unlimited for Deployed pursuant to the Agreement was from Comfort Zone Portables ("Comfort Zone"), the Florida Department of Emrgency Mangement (Fl-DEM) Mangement, and Florida Department of Housing (Fl-DOH) (Doc. No. 146, Defendant's MSJ, p. 3). It is equally undisputed that Deployed paid Unlimited $366,522.00 pursuant to some agreement (Id). According to Deployed, this sum reprensents 10% of "rental" under some agreement (Id). Plaintiff's position is that the 10% is for "everything"

generated by Unlimited, regardless of "rent classifcation, and that there is still $273,242.00 owing Plaintiff for this work as 10% of gross (Doc. No. 100, Ex. No. "1", ¶9;Unlimited Aff. ¶15). This is a dispute over term "not" dispute over agreement. It is equally undisputed that Johnson would continually send Deployed writings reflective the 10% gross during the Comfort Zone work to which Deployed never objected (Doc. No. 100, Ex. No. 1, Unlimited Aff. ¶ 10; Johnson Deposition, Ex. No.s 4-10; Supp. Aff. ¶3 attached hereto as Ex. No. "1"). Indeed, Deployed "never obejcted" to any terms contained in the writings, much less the 10% of gross and was "fully aware" of the course of dealing between the parties and the way they had been doing business under the Agreement (Johnson Deposition, Ex. No. 9; Supp Aff. ¶3, attached hereto as Ex. No. "1"). Again, this shows, at a minimal that there was "some" agremment between the parties to pay Unlimited 10% of "something", and that Deployed benefitted therefrom consistent with Plaintiff's MSJ for unjust enrichment (Count II)

As set forth in the deposition of Stapleton, additional work also was "undisputedly" procurred by Unlimited for Deployed with the Louisian Department of Homeland Secuirty pursuant to some agreement (Stapleton Deposition, p. 135-139, Ex. No. 24-25; Doc. No. 104, Ex. No. "1"; Unlimited Aff. ¶¶ 12,13). Deployed openly admits that Unlimited was the procuring casue of the work pursuant to some agreement, but then testified it would "not" honor the admitted Agreement becasue of the lawsuit (Stapleton Depoistion, p. 135-139, Ex. No. 4). This again shows there is undisputed fact that Deployed "had agreement" to pay Unlimited 10% (or something) pursuant to some agreement, and that Deployed benfitted thereform consistent with Plaintiff's MSJ for unjust enrichment (Count II)

The implication from each of the preceeding procurement is profound. If Unlimited procured the work and/or paid Unlimited for the work procurred, reagrdless of percenatge, there must have been "some" agreement bewteen the parties as a matter of "undipsuted fact" or logical implication. Thus, the real dispute is one relating to the terms of the admitted agreement, "not" the existence of the basic agreement or contract, and certainly not the benefit undisputeldy conferred thereby, which is the basis of Plaintiffs MSJ as to Count II (unjust enrichment"). Quite frankly, Deployed's MSJ overlooks this implication in the classic case of "having cake and eating it too". Deployed's MSJ admits the prceeding procurements and payments were pursuant to "some" agreement, but then, inconsitently seeks summary judgment becasue there is no agreement due to the failure of the terms of the admitted agreement Deployed had been perfoming. (Doc. No. 146, MSJ, pp. 4,5). As discussed below, Deployed also inconsistently contends that the "admitted agreement" conatined no requirement for accounting (Doc. No. 146, Defendant's MSJ, p. 21) Thus, in its simplest sense, Deployed's MSJ shows there was an agreement, was performance under an agreement, payment under an agreement, and benefit conferred to Deployed, the latter being the basis of Plaintiff's MSJ as to Count II (unjust enrichmenet)—the only real dispute appears to be all the terms of the agreement, not the basic agreement, and certainly not the existence thereof.

Based thereon, there was admittedly an agreement or contract between the parties, or at least disputed fact as to the exitsence of a contract to thereby preclude summary judgment. If anything, the Court should now grant Plaintiff's motion summary judgment (Doc. No. 144) based on Defendant's MSJ becasue Defendant admits to receiving benefit under "some" agreement with Plaintiff.

### Clearbrook (PBSJ) subcontract with Deployed

Defendant's MSJ pp 5-13(Doc. No. 146) contends Unlimited had nothing to do with obtaining, procuring, or assisting Deployed in obtaining the Clearbrook contract and is entitled to no payment. Based thereon, Defendant insultingly contends that Plaintiff had to "abandon its original theory of procurement of Clearbrook and substituting a theory of corruption and intrigue" (Doc. No. 146, Defendant's MSJ, p11). In striking contrast, and dispute, Plaintiff contends throughout Plaintiff's MSJ (Doc. No. 144) that Unlimited had everything to do with the contract, based upon Unlimited's relationship with PBSJ, who was teaming with Clearbrook as a front to obtain FEMA business. Unabashedly, Plaintiff attests that it was responsible for the Deployed subcontract with Clearbrook through PBSJ, the bringing of the parties together, and the "expending of effort" to bring the relationship to Deployed (Supp. Aff. ¶5, attached hereto as Ex. No. 1), regardless of Deployed "now questioning the effort" (Defendant MSJ, p. 18) ---- ironically, after Deployed made in excess of $75 million because of Plaintiff's efforts as set forth in Plaintiff's MSJ. Unlimited performed as agreed and should be paid regardless of Deployed's attempts to negate Unlimited's "efforts", which at minimal, are disputed issues of fact (See Supp. Aff. ¶3, attached hereto as Ex. No. "1" attesting to "effort"). The Complaint was amended to simply reflect this relationship, which according to PBSJ is "not" unusual (Dep. Lawson, p 96 [Lines 19-25], p. 97 [Lines 1-10]) while remaining steadfast to the basic agreement alleged in the original complaint, to wit, that Deployed agreed to pay Unlimited 10% of everything. The only thing sinister is that Deployed tried to hide the PBSJ relationship in a series of discovery games and the making of approximately $75 million "after" Unlimited procured the PBSJ relationship,

as discussed in Plaintiff's MSJ, and "after" Unlimited procured the Clearbrook, as discussed in Plaintiff's MSJ and attested by Unlimited in Supp. Aff. ¶5, attached hereto as Ex. No. 1)

As set forth in Plaintiff's MSJ, PBSJ was the team manager and leader of Clearbrook for all base camps with FEMA (See also Unlimited Supp. Aff. ¶5 attached hereto as Ex. No. 1, detailing how Unlimited was required to approve Deployed before any FEMA work ). Based thereon, PBSJ required the approval and reference of long time friend and colleague Johnson "before" Deployed could ever be hired to perform any contracts under the teaming agreement for base camps PBSJ had with Clearbrook. Undisputedly, absent the approval of Johnson, Deployed would not have been hired directly by PBSJ or indirectly through teaming partner (Supp. Aff. ¶7, attached hereto as Ex. No. 1 attesting to the approval and the adverse result of not approving).

## II. OVERVIEW OF THE MATERIAL FACTS

### a. The relationship between Unlimited and Deployed

The basic agreement between Unlimited is discussed above and in Plaintiff's MSJ. Basically, Deployed agreed to pay Unlimited of 10% of gross revenue or everthing generated becasue of Plaintiff. The 10% was not limited to rentals but covered everything earned becasue of Deployed. Unlimited admits that it was paid $366,562.00 from work related to Comfort Zone. However, Unlimited attests that additional monies are "still owed" for this work totalling $273,242.00 pursuant to "some" agreement (Doc. No. 100, Ex. No. 1,Unlimited Aff. ¶ 15). Deployed does not even dispute this arrerage based on the Agreement.

In addition, Unlimited has "not" been paid for every contract Unlimited procurred

for Deployed. Indeed, paragraph 13 and 14 of Unlimited's Affidavit (Doc. No. 104, Ex. No. "1") identifies 14 (fourteen) contracts for which payment has not been made despite benefit of contract being conferred by Unlimited to Deployed, approximating in excess of $500 million (Unlimited Supp. Aff., ¶7, attached hereto as Ex. No. "1")

Deployed then contends that Unlimited, through its President, a lay man (not an attorney) has invented a legal concept called the "oral/written agreement" in order to prevail. As testified by Unlimited (Dep. C. Johnson, Errata p. 404 [L. 19-L.22]), this term refers to an oral agreement that was reflected in writing and course of performance. Before making legal pronouncement (Defendant MSJ, p. 16) there is no such thing as an "oral/written" agreement, Deployed should review Article II of the Uniform Commercial Code (Sales) for analogous guidance. Contracts for the sale of goods are routinely based oral orders, followed by conflicting purchase orders, invoices, other writings, and course of performance, reflecting the overall agreement of the parties though there is no signed written agreement (frequently termed the "battle of the forms"). Though there may be no "signed" agreement, there are writings that comprise the agreement of the parties that will be deemed accepted by course of performance, and if no objection made. Based thereon, the testimony of Unlimited is a fairly accurate description. Moreover, Deployed never voiced any objection to any writings (Dep. C. Johnson, Errata, p. 31 [L.6-L8], p. 33 [L.11-L.14}, p. 61, [L.8-L.10], p. 290 [L. 21]. p. 158 [L.19-L21]{"He never objected"}) See also Doc. No. 100. Ex. No. 1, Unlimited Aff. ¶10; Supp. Aff. ¶ 3, attached hereto as Ex No. "1").

Deployed contends that Unlimited has been unable to set forth the terms of the contract and can not state cause of action for breach This is not proper in a motion for

summary judgment. Regardless, Count I of the original complaint sets forth all elements to plead breach of contract as does "Amended' Count I (breach of contract) from the Amended Complaint that is now the operative pleading pursuant to order dated April 24, 2009. Deployed is very well aware of the terms of the contract based on pleading, the testimony of Johnson, the affidavits of Johnson (Doc. No. 100, Ex. No. 1; Supp Aff. attached hereto as No. "1"), and discovery responses from Unlimited (See Plaintiff Rog Responses No. 2,3, attached hereto as Ex. No. "2"). Unlimited is clearly able to set forth the Agreement and, steadfastly, has done so throughout the case and at every opportunity.

As for Unlimited's corporate representative "not being able to testify, as to contracts procured (Defendant's MSJ, p. 7), the presented testimony is misleading to say the least. The exchange was accompanied by continuing objections to form necessitated by Deployed asking Unlimited corporate representative to make "legal conclusions" as to the basis for alleged causes of action" and legal terminology used in the complaint (See continuing objections to form, Dep. C. Johnson., pp 104-120) This was the reason Johnson felt compelled to refer questions to his attorney (Dep. C. Johnson, Errata, p. 368 [L.22-L25}[...I really did not understand those questions I referred to my attorney because they seemed like legal questions"}. In addition, at the time of deposition, Unlimited had "just started" to receive discovery from Deployed (after order to compel) showing the full scope business that had been obtained because of Plaintiff's marketing efforts. Throughout this case, Unlimited has argued that most if not of this information was "solely" in possession of the Deployed, who refused to account, and produce without court order. It was only after receipt and review of this discovery, after deposition of Johnson, that Unlimited was able to allege the scope of the contracts procured in the

Amended Complaint and make affidavit attesting to the business procured (Doc. No. 100, Ex. No. '1", Affidavit of Johnson, ¶13).

**c. The PBSJ Contratcs**

As set forth in Johnson's affidavit (Doc. No. 100, Ex. 1, Unlimited Aff. ¶12-13) he conferred 14 (fourteen) contracts to Deployed, including the PBSJ contracts Deployed admitts Johnson conferred pursuant to "some" agreement (Doc. No 146, MSJ, p. 19). The PBSJ contrats include: 1) IA TAC contract; 2) Wrighstville Beach Contartc 3) natinal Rural Electric Assocaition contarct. Deployed seemigly reocgnizes that these contacrts were obtained "becasue" of "some" Unlimited effort pursuant to "some" agreement but contends that Deployed is, somehow, still entitled to summary judgment becasue it has only been paid $11,228.33 form PBSJ as part of traing relating to the IA TAC contrat and becasue it has "yet to be paid" on the remaining contracts that are contingent on a Hurricane. In response, Plaintiff, contends it is entitled to 10% of "everything" conferred be it $11,228.33 or the value of contingency contract. Contingency does not render a contract without value. Indeed, Unlimited approximates all potential benefit from the contracts as being $500 million (Supp. Aff. ¶8, attached hereto as Ex. No. 1) as will be testified at trial.

**d.     The Agreement between the Parties "Does" provide for an accounting**

Speaking with fork tongue, Deployed now admits an agreement exists, but says the agreement does not provide for an accounting. However, "correct" testimony must be put in context of the overall "Agreement" that is comprised of oral agreement reflected and supplemented by writings and course of performance as discussed above. As testified by Johnson, there were not multiple oral agreements, but one overall Agreement as

between the parties reflected by writings and performance (Dep. C. Johnson, Errata, p. 14 [L.17]; Doc. No. 104, Ex. 1, Unlimited Affidavit, ¶9) Counsel did not understand this distinction during deposition and ignores the errata sheet to mislead the court. The following is the full and current exchange showing there was a right to accounting:

> **Q**: Okay. So what I am trying to still understand are what are the terms of the oral agreement that Mr. Stapleton agreed to? (Dep., C. Johnson, p.33 [L.18-L.19])
> **A**. The basic terms of the Agreement were that Unlimited would receive 10% gross of everything it brought to the table for Deployed and that Deployed was to account to Unlimited as to the monies earned (Dep., C. Johnson, Errata, p.33 [L.21]
> **Q**: The oral agreement did not have a right to accounting, did it?
> **Mr. Nicholas**: Objection to form
> **A**: I refer that question to my attorney.
> Mr. Nicholas: You can answer that question, Chuck. He's—I think in counsel's defense, he's trying to establish the basis of where the accounting come from.
> **A.**: Yeah
> **Mr. Nicholas**: Is it a combination of both? Maybe that's your confusion.
> **A**: Its----in the written document.
> **Q**: And that was never signed
> **A**. No.
> **A**. No.
> **Q**: So there was nothing in the oral agreement that agreed to a full accounting; is that correct(Dep. C. Johnson, p. 122, [L.3-L.24])
> **A**. There was a requirement of accounting in the Agreement. (Dep. C. Johnson, Errata, p. 122 [L. 24]
> **Q**: Was it during this call that you reached your agreement with— Deployed Resources, this oral agreement that you've described? 31 1-5
> **Mr. Nicholas**: Objection to form. You can answer it Chuck. (Dep. C. Johnson, p. 31, [L.1-L.5])
> **A**: We agreed to all terms of the sent agreement. (Dep. C. Johnson, Errata p. 31 {L 6-L8]
> **Q**: Okay, the agreement you sent to him is different than an oral agreement with—well, when did you have (Dep. C. Johnson, p. 31 L10 L12]).
> **A.** What we discussed was part of the Agreement (Dep. C. Johnson, Errata, p.31 [L. 13-L14]

In addition to the testimony, the exhibits attached to the deposition of Johnson reflect right to accounting (. See Ex. Nos. 5, 6, 7, and 10 (agreements exchanged between parties

during course of performance, without objection, each of which contain accounting requirement (See Agreements, Section III, ¶c). The affidavits of Chuck Johnson reflect right to accounting (Doc. No. 100., Ex. No. 1, Unlimited Aff. ¶9; Supp. Aff. ¶2). As a result, there is disputed fact

## III. SUMMARY JUDGMENT SHOULD NOT BE GRANTED

### a. Summary judgment is not the appropriate remedy

Summary judgment is not appropriate when there are genuine issues of disputed fact, and particularly, when there is some factual basis for the claim. <u>Celotex Corp. v Catrett</u>, 477 U.S. 317, 106 S. Ct. 2548 (1986). In this case, the pleadings, affidavits of Unlimited, and Plaintiff's own motion for summary judgment, which covers, and disputes, most of the very "same" points as set forth in Defendants motion, show there are disputed issues of fact pursuant to Fed. R. Civ. P. 56, particularly, with all inferences construed in favor of Plaintiff. Moreover, and as noted at the beginning of this response, Deployed has not moved for summary judgment as to Count II (unjust enrichment), which Deployed's MSJ actually supports, and should now be granted, because it is not derivative of there being any contract.

### b. Partial Summary Judgment

The issues identified by Deployed can not be resolved by partial summary judgment because they are but abstract parts of the entire relationship between the parties as now alleged in the Amended Complaint and concern disputed issues of fact relating to the total "Deployed Benefit" conferred by Unlimited. Indeed, as set forth in Plaintiff's competing MSJ, there is disputed fact as to how Deployed obtained the Clearbrook business through PBSJ, all monies owing from all the benefit conferred by Unlimited,

and dispute over agreement terms (not agreement existence). The only issue for partial resolution is that set forth by Plaintiff in Plaintiff's MSJ, to wit, the benefit was conferred by Unlimited to Deployed as Defendant admits.

## V. CONCLUSION

There are genuine issues of disputed fact pursuant to Fed. R. Civ. P. 56 as set forth in affidavits and other matters of record. Deployed's motion for summary judgment should be denied, and Plaintiff's motion for summary judgment granted.

Dated this 25th day of June 2009

/s/ DANIEL A. NICHOLAS
DANIEL A. NICHOLAS, ESQUIRE
Florida Bar No.: 847755
BRADLELY S. BELL, ESQUIRE
Florida Bar No.: 0184306
CRUSER MITCHELL NICHOLAS & BELL
501 E. Kennedy Blvd., Suite 730
Tampa, Florida 33602
Phone: (813) 221-3114
Facsimile: (813) 221-3033
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via U.S. Mail to: Richard G. Rumrell, 9995 Gate Parkway North, Suite 190, Jacksonville, Fl 32246 and facsimile (904) 996-1120 on this 25th day of June, 2009.

/s/ DANIEL A. NICHOLAS
DANIEL A. NICHOLAS, ESQUIRE
Florida Bar No.: 847755
BRADLELY S. BELL, ESQUIRE
Florida Bar No.: 0184306
CRUSER MITCHELL NICHOLAS & BELL
501 E. Kennedy Blvd., Suite 730
Tampa, Florida 33602
Phone: (813) 221-3114
Facsimile: (813) 221-3033
Attorney for Plaintiff